1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALFREDO GOMEZ,                              No.  2:11-cv-0649 KJM DAD P

12              Plaintiff,

13        v.                                     ORDER AND

14   MIKE McDONALD et al.,                       FINDINGS AND RECOMMENDATIONS

15              Defendants.

16

17        Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking relief under

18   42 U.S.C. § 1983.  This matter is before the court on the parties' cross-motions for summary

19   judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.

20        For the reasons discussed below, the court will recommend that plaintiff's motion for

21   summary judgment be denied, and defendants' motion for summary judgment be granted.

22                                   **BACKGROUND**

23        Plaintiff is proceeding on an amended complaint against defendants Davey, Domondon,

24   Gower, Sanders, and Van Leer.  Therein, plaintiff alleges as follows.  On October 6, 2009,

25   defendants placed him in a Single Cell Unit/Special Purpose Segregation Unit ("SCU/SPSU") at

26   High Desert State Prison (HDSP) and retained him there for eight months because they believed

27   /////

28   /////

1

1    he was a member of the "Two-Five" prison group.[1]  While segregated, plaintiff alleges that

2    defendants refused to inform him of any disciplinary charges being brought against him or of

3    their reasons for holding him in segregation and did not provide him with an informal non-

4    adversary hearing to allow him to present his views.  While plaintiff was held in segregation

5    defendants denied him outdoor exercise, forced him to stay in a cell in which the temperature

6    averaged only thirty-five (35) degrees, and refused to provide him with personal hygiene

7    necessities.  On May 25, 2010, defendants asked plaintiff to sign a document stating that he had

8    no intention of participating in any "Two-Five" activities.  Plaintiff signed the document, and two

9    days later, he was returned to the general population at the institution where he was incarcerated.

10   (Am. Compl. Attach. at 6-32.)

11        At screening, the court found that plaintiff's amended complaint appeared to state

12   cognizable claims for relief against defendants Davey, Domondon, Gower, Sanders, and Van

13   Leer for denial of plaintiff's right to due process under the Fourteenth Amendment in connection

14   their alleged involvement in his placement and retention in an SCU/SPSU.  In addition, the court

15   found that plaintiff's amended complaint appeared to state a cognizable claim against defendants

16   Davey, Gower, and Van Leer for cruel and unusual punishment under the Eighth Amendment for

17   their alleged involvement in denying plaintiff outdoor exercise, placing him in a cold cell, and

18   refusing to provide him with personal hygiene items.  (Doc. No. 9)

19                 **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

20        Summary judgment is appropriate when the moving party "shows that there is no genuine

21   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

22   Civ. P. 56(a).

23        Under summary judgment practice, the moving party "initially bears the burden of

24   proving the absence of a genuine issue of material fact."  In re Oracle Corp. Securities Litigation,

25   627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

26

27   _____

     [1]  Defendants refer to the "Two-Five" as a "group," presumably die to the use of that term in the

28   applicable regulations.  The undersigned has attempted to adopt that characterization in these
     findings and recommendations.

                                      2

1   The moving party may accomplish this by "citing to particular parts of materials in the record,

2   including depositions, documents, electronically store information, affidavits or declarations,

3   stipulations (including those made for purposes of the motion only), admission, interrogatory

4   answers, or other materials" or by showing that such materials "do not establish the absence or

5   presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

6   support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

7          When the non-moving party bears the burden of proof at trial, "the moving party need

8   only prove that there is an absence of evidence to support the nonmoving party's case." Oracle

9   Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.). See also Fed. R. Civ. P. 56(c)(1)(B).

10  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

11  against a party who fails to make a showing sufficient to establish the existence of an element

12  essential to that party's case, and on which that party will bear the burden of proof at trial. See

13  Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the

14  nonmoving party's case necessarily renders all other facts immaterial." Id. In such a

15  circumstance, summary judgment should be granted, "so long as whatever is before the district

16  court demonstrates that the standard for entry of summary judgment, . . ., is satisfied." Id. at 323.

17         If the moving party meets its initial responsibility, the burden then shifts to the opposing

18  party to establish that a genuine issue as to any material fact actually does exist. See Matsushita

19  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the

20  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

21  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

22  admissible discovery material, in support of its contention that the dispute exists. See Fed. R.

23  Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the

24  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

25  governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

26  Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

27  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

28  party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

3

1   In the endeavor to establish the existence of a factual dispute, the opposing party need not

2   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

3   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

4   trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

5   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

6   Matsushita, 475 U.S. at 587 (citations omitted).

7   "In evaluating the evidence to determine whether there is a genuine issue of fact," the

8   court draws "all reasonable inferences supported by the evidence in favor of the non-moving

9   party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is

10   the opposing party's obligation to produce a factual predicate from which the inference may be

11   drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

12   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

13   party "must do more than simply show that there is some metaphysical doubt as to the material

14   facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

15   nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation

16   omitted).

17   **OTHER APPLICABLE LEGAL STANDARDS**

18   I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

19   The Civil Rights Act under which this action was filed provides as follows:

20   Every person who, under color of [state law] . . . subjects, or causes
    to be subjected, any citizen of the United States . . . to the
    deprivation of any rights, privileges, or immunities secured by the

21   Constitution . . . shall be liable to the party injured in an action at
    law, suit in equity, or other proper proceeding for redress.

22

23   42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

24   actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

25   Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

26   (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

27   meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

28   omits to perform an act which he is legally required to do that causes the deprivation of which

4

1 | complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

2 |      Moreover, supervisory personnel are generally not liable under § 1983 for the actions of

3 | their employees under a theory of respondeat superior and, therefore, when a named defendant

4 | holds a supervisorial position, the causal link between him and the claimed constitutional

5 | violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979);

6 | Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations

7 | concerning the involvement of official personnel in civil rights violations are not sufficient.  See

8 | Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

9 | II.  The Fourteenth Amendment

10 |      The United States Supreme Court has held that the procedural protections guaranteed by

11 | the Fourteenth Amendment Due Process Clause only apply when a constitutionally protected

12 | liberty or property interest is at stake.  See Wilkinson v. Austin, 545 U.S. 209, 221 (2005); see

13 | also Marsh v. County of San Diego, 680 F.3d 1148, 1155 (9th Cir. 2012); Brittain v. Hansen, 451

14 | F.3d 982, 999-1000 (9th Cir. 2006).  The Due Process Clause itself does not give prisoners a

15 | liberty interest in avoiding transfer to more adverse conditions of confinement.  See Meachum v.

16 | Fano, 427 U.S. 215, 225 (1976).  However, states may create liberty interests which are protected

17 | by the Due Process Clause.  These circumstances generally involve a change in condition of

18 | confinement that imposes an "atypical and significant hardship on the inmate in relation to the

19 | ordinary incidents of prison life."  Sandin v. Connor, 515 U.S. 472, 484 (1995).

20 | III.  The Eighth Amendment

21 |      The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment

22 | prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v.

23 | Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  In order to

24 | prevail on a cruel and unusual punishment claim, a prisoner must prove that objectively he

25 | suffered a sufficiently serious deprivation and that subjectively prison officials acted with

26 | deliberate indifference in allowing or causing the deprivation to occur.  See Farmer v. Brennan,

27 | 511 U.S. 825, 834 (1994); Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

28 | /////

1    IV.  <u>Qualified Immunity</u>

2            Government officials enjoy qualified immunity from civil damages unless their conduct

3    violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267 F.3d 895, 910

4    (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is

5    presented with a qualified immunity defense, the central questions for the court are:  (1) whether

6    the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

7    defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

8    was "clearly established."  Saucier v. Katz, 533 U.S. 194, 201 (2001).  The Supreme Court has

9    held that "while the sequence set forth there is often appropriate, it should no longer be regarded

10   as mandatory."  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  In this regard, if a court decides

11   that plaintiff's allegations do not make out a statutory or constitutional violation, "there is no

12   necessity for further inquiries concerning qualified immunity."  Saucier, 533 U.S. at 201.

13   Likewise, if a court determines that the right at issue was not clearly established at the time of the

14   defendant's alleged misconduct, the court may end further inquiries concerning qualified

15   immunity at that point without determining whether the allegations in fact make out a statutory or

16   constitutional violation.  Pearson, 555 U.S. at 236-242.

17           "A government official's conduct violate[s] clearly established law when, at the time of

18   the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable

19   official would have understood that what he is doing violates that right.'"  Ashcroft v. al-Kidd,

20   563 U.S. 731, ___, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635

21   (1987)).  In this regard, "existing precedent must have placed the statutory or constitutional

22   question beyond debate."  Id.  See also Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002)

23   ("The proper inquiry focuses on  . . . whether the state of the law [at the relevant time] gave 'fair

24   warning' to the officials that their conduct was unconstitutional.") (quoting Saucier, 533 U.S. at

25   202).  The inquiry must be undertaken in light of the specific context of the particular case.

26   Saucier, 533 U.S. at 201.  Because qualified immunity is an affirmative defense, the burden of

27   proof initially lies with the official asserting the defense.  See Harlow, 457 U.S. at 812.

28   /////

6

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS AND EVIDENCE**[2]

Plaintiff has submitted a statement of undisputed facts supported by declarations signed under penalty of perjury by plaintiff and several of his fellow inmates.  That statement of undisputed facts is also supported by citations to plaintiff's amended complaint, California Department of Corrections and Rehabilitation ("CDCR") and prison memoranda and program status reports from September 21, 2009, through June 8, 2010, administrative appeals and prison officials responses thereto, miscellaneous documents from plaintiff's central file, and defendants' responses to plaintiff's discovery requests.  The evidence submitted by the plaintiff in support of the pending motion for summary judgment establishes the following.

1. Prison officials justified plaintiff's removal from the Sensitive Needs Yard on October 6, 2009, based on his alleged membership, association, or ties with the "Two-Five" group and to ensure the safety and security of the institution.  Prison officials also sought to investigate and identify substantiating evidence of plaintiff's affiliation with gang activities because they suspected he was involved in gang activity or participating in the promotion of violence on High Desert State Prison's ("HDSP's") Facility B, including the attempted murder of other inmates on September 17, 2009, attacks on child molesters or rapists, and assaults and threats on staff and inmates. (Pl.'s Exs. A & B.)

2. In his amended complaint, plaintiff is challenging the fact that while he was housed at HDSP, Facility B, Building 2, between October 6, 2009, through May 26, 2010, prison officials denied him procedural due process, outdoor exercise, warmth while in a cold cell, and hygiene items.  (Am. Compl. ¶¶ 20 & 66.)

3. Certain California regulations create a liberty interest in not arbitrarily subjecting an inmate to administrative and disciplinary segregation.  See Toussaint v. McCarthy, 801 F.2d 1080 (9th Cir. 1986); Madrid v. Gomez, 889 F. Supp. 1146, 1271 (N.D. Cal.

---

[2]  The court has reviewed plaintiff's proposed statement of undisputed facts in its entirety.  The court has omitted reference to certain of plaintiff's proposed facts that are immaterial to resolution of the parties' motions for summary judgment, unsupported by admissible evidence, and/or redundant.

1995).

4. On October 31, 2003, plaintiff's work-group/privilege status was upgraded from A2-B to A1-A. (Gomez Decl. ¶ 6.)

5. At no point between September 17, 2009, and May 26, 2010, was plaintiff's A1-A status formally denied, modified, or temporarily suspended by a disciplinary officer or by a classification.  (Gomez Decl. ¶ 7.)

6. Between October 31, 2003, and October 5, 2009, plaintiff's A-1A status allowed him phone calls, outdoor exercise, and dayroom, visiting, and canteen privileges.  It also allowed him shower, personal hygiene, and dining hall privileges.  (Gomez Decl. ¶¶ 8 & 9.)

7. While housed at California State Prison-Los Angeles County in Lancaster, between approximately January 2003-December 2006; Richard J. Donovan-Correctional Facility in San Diego between approximately December 2006, and February 4, 2008; and HDSP in Susanville between February 6, 2008, and October 25, 2010, Gomez personally experienced multiple conditions which officials characterized as lockdowns during which officials at each of those prisons never:

   a. confiscated Gomez's hygiene items.  (Gomez Decl. ¶ 10a.);

   b. confiscated any of Gomez's linens.  (Gomez Decl. ¶ 10b.);

   c. confiscated any of Gomez's personal and state-issued clothing.  (Gomez Decl. ¶ 10c.);

   d. confiscated any of Gomez's personal property.  (Gomez Decl. ¶ 10d.);

   e. prohibited Gomez from having verbal and written communication with other inmates.  (Gomez Decl. ¶ 10e.);

   f. personally accused Gomez of multiple acts of serious misconduct.  (Gomez Decl. ¶ 10f.);

   g. personally accused Gomez of being a member and/or an associate of the "Two-Five" group.  (Gomez Decl. ¶ 10g.)

8. Only while housed at HDSP did Gomez personally experience for the first time

8

multiple conditions which officials there characterized as a modified program in which HDSP officials:

    a. confiscated Gomez's hygiene items.  (Gomez Decl. ¶ 12a.);

    b. confiscated Gomez's linens.  (Gomez Decl. ¶ 12b.);

    c. confiscated Gomez's personal and state-issued clothing.  (Gomez Decl. ¶ 12c.);

    d. confiscated Gomez's personal property.  (Gomez Decl. ¶ 12d.);

    e. prohibited Gomez from having verbal and written communication with other inmates.  (Gomez Decl. ¶ 12e.);

    f. personally accused Gomez of multiple acts of serious misconduct.  (Gomez Decl. ¶ 12f.);

    g. personally accused Gomez of being a member and/or associate of the "Two-Five" group.  (Gomez Decl. ¶ 12g.)

9.  Between February 6, 2008, and October 25, 2010, Gomez was never afforded a disciplinary hearing or found guilty of a prison disciplinary infraction.  He was also never informed of any disciplinary findings or disposition, or of a right to appeal any disciplinary findings or disposition.  (Gomez Decl. ¶ 13.)

10. Gomez was never personally interviewed by the Institution Gang Investigator ("IGI"), or designee, or given an opportunity to be heard in regards to the source items relied upon by officials, which allegedly indicate Gomez's membership or association with the "Two-Five" group.  (Gomez Decl. ¶ 14.)

11. Gomez is currently not and has never been a member or an associate of the "Two-Five" group.  (Gomez Decl. ¶ 16.)

12. Between October 6, 2009, and May 25, 2010, while housed at HDSP, Facility B, Building 2, plaintiff did not get any phone calls, outdoor exercise, or dayroom, visiting, and canteen privileges.  He also was not allowed to report to his prison job assignment, possess personal property (from October 6, 2009, through November 20, 2009), possess state-issued clothing (from October 6, 2009, through November 20, 2009), or possess personal hygiene items (from October 6, 2009, through October 10,

2009).  Plaintiff did not have access to the dining hall or daily showers and was not allowed to speak to other inmates who were not alleged "Two-Five" members or affiliates.  Plaintiff did not receive notice of the rules of the SCU/SPSU or an initial assessment and training plan for his placement and was not released from that unit within ninety days of his initial placement.  Plaintiff also did not receive periodic classification committee review or a psychological evaluation after thirty days. Plaintiff was not released from the SCU/SPSU Unit until HDSP officials believed he should be released and afforded an opportunity to sign an Unlock Chrono.  (Gomez Decl. ¶ 26.)

13. Between Tuesday, October 6, 2009, at approximately 9:30 a.m. through approximately 1:30 p.m., Gomez continuously remained with his hands hand-cuffed behind his back and was only allowed to wear, and remained wearing, his underwear and sandals throughout such time.  (Gomez Decl. ¶¶ 18a, 19a, 20b & 21d.)

14. When Gomez was housed in Facility B, Building 2, in "C" section, cell 246 on October 6, 2009, that cell was completely bare except for two mattresses.  (Gomez Decl. ¶ 21e.)

15. According to plaintiff, the inside and outside cell walls at HDSP, Facility B, Building 2, cell 246 consist of thick concrete and have no insulation.  (Gomez Decl. ¶ 21j.)

16. Pursuant to state-wide policy for California prisons:  "[w]henever possible, building operators shall operate and adjust controls to get optimum advantage from outside temperatures for meeting cooling demand (e.g., using outside air economizers and night flush cycles)."  (Defs.' Ex. P ¶ 1.)

17. Between October 6, 2009, and November 20, 2009, the outside temperatures at HDSP, averaged a maximum of fifty-seven (57) degrees and a minimum of thirty-one (31) degrees.  (Pl.'s Ex. D.)

18. Between October 6, 2009, and November 20, 2009, the concrete cell walls maintained the cells at HDSP, Facility B, Building 2 consistently cold.  (Gomez Decl. ¶¶ 24b, 28.)

19. On the first day plaintiff arrived at HDSP on February 6, 2008, he was issued what is

commonly referred as a "fish-kit" or "fish-roll" which among other things, included sanitary hygiene items such as one roll of toilet paper and one bar of soap.  On the same day, prison officials also issued him clothing and linen.  (Gomez Decl. ¶¶ 17, 25 & 36.)

20. While housed at HDSP, plaintiff continued to be re-issued one bar of soap and one roll of toilet paper once a week on every Saturday morning.  (Gomez Decl. ¶ 36.)

21. At no point from Tuesday, October 6, 2009, at approximately 1:30 p.m., through Saturday, October 10, 2009, at approximately 7:42 a.m., was plaintiff issued toilet paper and soap.  (Gomez Decl. ¶¶ 21 e, f, g, h & 23 c.)

22. Between October 20, 2009, and March 8, 2010, defendant Van Leer had knowledge that plaintiff and other similarly segregated inmates in HDSP, Facility B, Building 2 were not receiving any form of outdoor exercise.  During such times, Van Leer was drafting recommendations to initially prohibit and thereafter continue to prohibit inmates identified as having participated in gang-related activities from receiving all outdoor exercise.  (Pl.'s Ex. A at 28-30, 41-43, 44-46, 47-49, 54-56, 57-59, 60-62, 63-65, & 66-68.)

23. Van Leer personally attended an Inmate Advisory Council ("IAC") meeting on December 24, 2009.  During the meeting, Van Leer was provided with notice from IAC members that those inmates segregated in Facility B, Building 2, such as plaintiff, were not receiving any outdoor exercise.  IAC members were then informed by Van Leer that plaintiff and other similarly segregated inmates would not receive any outdoor exercise until the conclusion of the investigation, which had no specific end date.  With respect to plaintiff, that investigation concluded on May 17, 2010, but plaintiff was not released from his confinement until May 26, 2010.  (Defs.' Exs. N & O, Defs.' SUDF 180-188.)

24. On October 6, 2009, defendants Gower, Davey, and Van Leer were all personally present and witnessed inmates, including plaintiff, wearing only their underwear and sandals from the time they had been removed from their regular General Population

cell to the time they were re-housed in Facility B, Building 2. (Gomez Decl. ¶¶ 19 b, c, d; and 20c.)

25. On October 6, 2009, defendants Gower, Davey, and Van Leer were tasked with overseeing and supervising the segregation of plaintiff and other similarly situated inmates. (Defs.' Opp'n to Pl.'s Mot. to Modify the Discovery and Scheduling Order, Ex. E (Defendant Gower's Response to Pl.'s Interrogatories, Set 1, Nos. 11 & 13, defendant Davey's Response to Pl.'s Interrogatories, Set 1, Nos. 1-2, defendant Van Leer's Response to Pl.'s Interrogatories, Set 1, Nos. 1 & 2.))

26. Between October 6, 2009, and May 25, 2010, the concrete yard located at HDSP, Facility B, adjacent to Building 2 was not being made available for use to any inmate. (Gomez Decl. ¶¶ 29, 30.)

27. The concrete yard adjacent to Building 2, consists of two yards, both of which have been previously used to safely afford outdoor exercise to approximately 30-100 inmates at one time. (Toledo Decl. ¶¶ 5, 7 & 14.)

28. According to inmate Toledo, prior to October 6, 2009, inmates on Facility B who were classified as C-status were afforded access to the concrete yard during the non-programing hours of other GP-SNY inmates, i.e., Monday through Friday, from 1 p.m. - 2 p.m. (Toledo Decl., ¶¶ 15 & 16.)

29. According to inmate Toledo, between 2001 and 2003, when he was on the concrete yard adjacent to Building 2, he saw two correctional officers and surveillance cameras supervising the yards with approximately thirty inmates on each yard. Such officers had lethal and non-lethal weapons necessary to protect any inmates from assault. (Toledo Decl. ¶¶ 5-6 & 15)

30. Between October 6, 2009, and May 26, 2010, only two correctional officers were required to safely escort segregated inmates such as plaintiff, to medical, law library, and visiting appointments. (Gomez Decl. ¶ 31.)

31. Between approximately September 17, 2009, and October 6, 2009, all inmates at HDSP, Facility B, including plaintiff were on modified program and confined to their

cells 24-hours a day.  (Pl.'s Ex. A at A1 & A28.)

32. From October 6, 2009, through October 20, 2009, inmates at HDSP, Facility B who were not alleged "Two-Five" members or associates, were confined to their cells for 24-hours a day.  (Pl.'s Ex. A at A34.)

33. From October 20, 2009, through October 24, 2009, inmates at HDSP, Facility B, who were not alleged "Two-Five" members or associates, were not on modified program and allowed normal programing.  (Pl.'s Ex. A at A29 & A34.)

34. On October 24, 2009, inmates at HDSP, Facility B, who were not alleged "Two-Five" members or associates, were placed on "suspended program."  (Pl.'s Ex. A at A31.)

35. Starting October 26, 2009, inmates at HDSP, Facility B who were not alleged "Two-Five" members or associates were on modified program and confined to their cells for 24-hours a day.  (Pl.'s Ex. A at A34.)

36. On November 24, 2009, inmates (excluding plaintiff) housed in the Gymnasium at HDSP, Facility B, and approximately twelve to fifteen inmates randomly housed in Buildings 1 through 5 in Facility B and who were considered critical workers, were afforded limited access to outdoor exercise in the Facility B main exercise yard.  (Pl.'s Ex. A at A40.)

37. Starting December 1, 2009, inmates at HDSP, Facility B, who were not alleged "Two-Five" members or associates were afforded limited programing as part of Phase-1 of the modified program.  (Pl.'s Ex. A at A41.)

38. Starting December 14, 2009, inmates at HDSP, Facility B, who were not alleged "Two-Five" members or associates were afforded limited programing as part of Phase-2 of the modified program.  (Pl.'s Ex. A at A40 & A47.)

39. Starting December 28, 2009, inmates at HDSP, Facility B, who were not alleged "Two-Five" members or associates were afforded limited programing as part of Phase-3 of the modified program.  (Pl.'s Ex. A at A47.)

40. Starting January 7, 2010, inmates at HDSP, Facility B, who were not alleged "Two-Five" members or associates were confined to their cells for 24-hours a day.  (Pl.'s Ex.

A at 52.)

41. Starting February 9, 2010, inmates at HDSP, Facility B, who were not alleged "Two-Five" members or associates were afforded limited programing as part of a re-instated Phase-2 of the modified program. (Pl.'s Ex. A at A54 & A57.)

42. Starting February 22, 2010, inmates at HDSP, Facility B, who were not alleged "Two-Five" members or associates were afforded limited programing as part of a re-instated/amended Phase-3 of the modified program. (Pl.'s Ex. A at A57.)

43. Starting February 28, 2010, all inmates in HDSP, Facility B, who were not alleged "Two-Five" members or associates, were confined to their cells for 24-hours a day. (Pl.'s Ex. A at 63.)

44. Starting March 2, 2010, all inmates at HDSP, Facility B, who were not alleged "Two-Five" members or associates were afforded limited programing as part of an amended Phase-3 of the modified program. (Pl.'s Ex. A at A66.)

45. Starting March 9, 2010, all inmates who were not alleged "Two-Five" members or associates were afforded limited programing as part of Phase-4 of the modified program. (Pl.'s Ex. A at A66.)

46. After June 9, 2010, all inmates at HDSP, Facility B (which included plaintiff) were placed on normal programming. (Pl.'s Ex. A at A21 & A78.)

47. Between October 6, 2009, and May 26, 2010, similarly segregated inmates who were confined at HDSP, Facility B, Building 2, first housed in "C" section and later in "A" section, could communicate with each other through the ventilation duct system, cell doors, during escorts to, from, and while inside the law library, medical and visiting, including through a written form commonly referred to as "fishing" in which the written communication is passed from cell to cell via a string line through the bottom of the cell door. (Gomez Decl. ¶ 32.)

48. Since plaintiff's incarceration in September 24, 2002, to the present, he has never been validated as either a member or associate of the "Two-Five" group pursuant to the procedures in 15 CCR § 3378(a)-(h). (Gomez Decl. ¶¶ 1 & 33.)

14

49. Since plaintiff's incarceration in September 24, 2002, to the present, he has never been issued a Rules Violation Report as defined in 15 CCR § 3312(a) (3). (Gomez Decl. ¶¶ 1 & 34.)

50. Between September 17, 2009, and June 9, 2010, no state of emergency was declared at HDSP, Facility B. (Defs.' Opp'n to Pl.'s Mot. to Modify the Discovery & Scheduling Order, Ex. E (Defendant Gower's Response to Plaintiff's Request for Admission No. 1.))

51. On October 6, 2009, as correctional officers were searching and inventorying the property of plaintiff and other similarly segregated inmates, such property was being placed inside transparent garbage bags. (Gomez Decl. ¶ 20g.)

52. On October 6, 2009, as plaintiff and other similarly segregated inmates were inside the Facility B dining hall, several correctional officers were randomly walking into the dining hall and asking several inmates (who had been removed from Buildings 1 through 5) to review and sign a CDC 1083 Inmate Property Inventory form. Plaintiff was not approached by any officer regarding the review and singing of a CDC 1083 Inmate Property Inventory form. (Gomez Decl. ¶ 20 e, f.)

53. On October 6, 2009, at approximately 1:30 p.m., plaintiff was physically escorted from the Facility B dining hall to his new housing at HDSP, Facility B, Building 2, cell 246. (Gomez Decl. ¶ 21.)

54. According to plaintiff, Buildings 2 and 3 at HDSP, Facility B are only separated from each other by a distance of approximately 15 feet. (Gomez Decl. ¶ 35.)

55. According to plaintiff, Buildings 1 through 5 at HDSP, Facility B, are separated by a minimum of approximately 200 feet from the Facility B dining hall. (Building-1 being the closest to the dining hall and Building 5 being the farthest.) (Gomez Decl. ¶ 35.)

56. Between October 6, 2009, and May 26, 2010, defendant Sanders had a duty to assist plaintiff by: (a) collecting and evaluating social data on Gomez; (b) collecting and evaluating behavioral data on Gomez; (c) evaluating Gomez's adjustment to an

15

assigned program; (d) preparing a CDC Form 812-A, Notice of Critical Information - Prison Gang Information; (e) preparing classification chromos; (f) **preparing** Gomez's central File (C-File) for legal reviews; and (g) attending Gomez's classification committee hearings.  (Defs.' Opp'n to Pl.'s Mot. to Modify the Discovery & Scheduling Order, Ex. E (Defendant Sanders' Responses to Request for Admission Nos. 4-6, 8, 9-10.))

57. Between March 2010 and May 26, 2010, defendant Domondon had a duty to assist Gomez by:  (a) collecting and evaluating social data on Gomez; (b) collecting and evaluating behavioral data on Gomez; (c) evaluating Gomez's adjustment to an assigned program; (d) preparing CDC Form 812-A, Notice of Critical Information - Prison Gang Information; (e) preparing classification chronos; (f) preparing Gomez's Central File (C-File) for legal reviews; and (g) attending Gomez's classification committee hearings.  (Defs.' Opp'n to Pl.'s Mot. to Modify the Discovery & Scheduling Order, Ex. E (Defendant Domondon's Responses to Request for Admission Nos. 2-4, 6-8.))

58. Warden McDonald and defendants Gower, Davey, Van Leer, and Domondon have characterized the "Two-Five" as a "Disruptive Group 1", "Disruptive Group", and/or "group."  (McDonald Decl. ¶ 2; Gower Decl. ¶ 2; Davey Decl. ¶ 2; Van Leer Decl. ¶ 3; Domondon Decl. ¶¶ 19, 21; Defs.' Opp'n to Pl.'s Mot. to Modify the Discovery & Scheduling Order, Ex. E (Defendant Sanders' Responses to Plaintiff's Interrogatories, Set 2, No. 4.))

59. Warden McDonald has sworn under oath that, during the relevant time period, the "Two-Five" was not designated a disruptive group.  (McDonald Decl. ¶¶ 7, 8 & 9.)

60. Warden McDonald and defendant Davey have both sworn under oath, that during the relevant times, the "Two-Five" group was not designated a "prison gang."  (Defs.' Opp'n to Pl.'s Mot. to Modify the Discovery & Scheduling Order, Ex. E (McDonald Dec1. ¶¶ 7, 8 & 9; Defendant Davey's Response to Plaintiff's Requests for Admission Nos. 5 & 16.))

61. Warden McDonald and defendant Davey have both sworn under oath that as of an unspecified date to the present, the "Two-Five" was designated as a "Security Threat Group II." (McDonald Dec1. ¶ 9; Defs.' Opp'n to Pl.'s Mot. to Modify the Discovery & Scheduling Order, Ex. E (Defendant Davey's Response to Plaintiff's Requests for Admission No. 16).)

62. Gomez was not provided with the confidential information identified in defendants' Statement of Undisputed Facts 114 via a CDC Form 1030, Confidential Information Disclosure Form.  (Gomez Decl. ¶ 44.)

63. Gomez was not provided with written notice at least 24-hours in advance of an interview with the IGI or designee with respect to the confidential information identified in defendants' Statement of Undisputed Facts 114.  (Gomez Decl. ¶ 45.)

64. Cells 246 and 150 in HDSP, Facility B, Building 2 are located in the "C" section of the building.  (Lopez Decl. ¶¶ 2 & 3.)

65. Cells 246 and 150 are located a distance of approximately 10 feet from each other. (Gomez Decl. ¶ 47.)

66. The bottom-half work order submitted with defendants' evidence contains a section for Resolution that is completely blank.  (Defs.' Ex. Q.)

67. The ventilation ducts in HDSP, Facility B, Building 2, "C" section, which consist of cells 135-150 and 235-250 are connected to one air conditioning unit located on the roof immediately above "C" section of the building.  (Gomez Decl. ¶ 48.)

68. The supply of air to the control booth in HDSP, Facility B, Building 2 is supplied by one small air conditioning unit which is located on the roof immediately above the control booth.  (Gomez Decl., ¶ 48.)

69. The air inside the cells in HDSP, Facility B, Building 2 is supplied by three separate air conditioning units.  One unit supplies air to "A" section which consists of cells 101-117 and 201-217.  The second unit supplies air to "B" section which consists of cells 118-134 and 218-234.  And the third unit supplies air to "C" section which consists of cells 135-150 and 235-250.  (Gomez Decl. ¶ 48.)

17

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND EVIDENCE**[3]

Defense counsel has submitted a statement of undisputed facts supported by declarations signed under penalty of perjury by Retired Warden McDonald as well as defendants Davey, Gower, Van Leer, Sanders, and Domondon.  That statement of undisputed facts is also supported by citations to plaintiff's amended complaint, confidential (sealed) prison memoranda and prison program status reports from the time period September 21, 2009, through May 25, 2010, a confidential (sealed) memorandum identifying plaintiff as a member of the "Two-Five" group, a copy of plaintiff's unlock agreement, various daily log reports, an IAC memorandum, and plaintiff's prison housing/movement sheet.  That statement of undisputed facts is also supported by HDSP Work Orders and heating logs for the relevant time period.  The evidence submitted by the defendants in support of the pending motion for summary judgment establishes the following.

**I. PARTIES AND RELEVANT WITNESSES**

**A. Plaintiff Alfredo Gomez (T-68620)**

1. Plaintiff Alfredo Gomez is an inmate in the custody of CDCR.  (Pl.'s Am. Compl.)

2. At the relevant times, Gomez was housed at HDSP in Susanville, California, where the events at issue took place.  (Pl.'s Am. Compl. at ¶ 9.)

**B. (Ret.) Warden McDonald – Non Party**

3. (Ret.) Warden McDonald was employed by CDCR as Acting Warden of HDSP from December 2008, through December 2010, at which time he was named the warden. He served as warden until his retirement in December 2012.  (McDonald Decl. ¶ 1.)

4. Warden McDonald alone, or his designee, had the authority to begin and end a modified program, or to adjust its terms once implemented.  (McDonald Decl. ¶ 10.)

5. With respect to the modified program implemented on September 18, 2009 (the "Two-Five" Modified Program), Warden McDonald did not have a designee and maintained sole authority to begin, adjust, and end it.  (McDonald Decl. ¶¶ 3, 11.)

---

[3]  The court has reviewed defendants' proposed statement of undisputed facts in its entirety.  The court has omitted reference to certain of defendants' proposed facts that are immaterial to resolution of the parties' motions for summary judgment, unsupported by admissible evidence, and/or redundant.

6.  Warden McDonald was not personally involved in conducting the investigation into the incidents that triggered the modified program at issue.  (McDonald Decl. ¶ 12.)

7.  Instead, Warden McDonald relied upon the investigations, analysis, and opinions of his staff.  This information included, but was not limited to, the status of any ongoing investigations, the evidence collected, the effectiveness of the restrictions imposed as part of the modified program, the likelihood that violence would occur without the restrictions in place, the appropriateness of the scope of the restrictions, and the prospects and timetable for a phased unlock to return to normal programming. (McDonald Decl. ¶ 13.)

8.  As Warden, McDonald also attended numerous weekly threat assessment meetings in which prison officials discussed the modified program, the status of the investigation, and the threats to safety and security in Facility B and the institution generally. (McDonald Decl. ¶ 14.)

9.  Throughout these threat assessment meetings, McDonald's staff provided their opinions and recommendations concerning the modified program, but no member of his staff had the authority to decide whether to adjust or terminate the modified program.  (McDonald Decl. ¶ 15.)

**C. Chief Deputy Warden Gower**

10. At all relevant times, Defendant Gower was employed by CDCR as Chief Deputy Warden at HDSP.  (Gower Decl. ¶ 1.)

11. Chief Deputy Warden Gower was responsible for reviewing the programming recommendations and evidence provided by subordinate staff, as well as evaluating the ongoing need for the "Two-Five" Modified Program.  (Gower Decl. ¶ 6.)

12. Chief Deputy Warden Gower also attended weekly meetings as part of the Warden's Executive Committee.  (Gower Decl. ¶ 7,8.)

13. Among the staff at HDSP, only the warden or his designee has the authority to begin or end a modified program, or to adjust its terms once implemented.  (Gower Decl. ¶ 4.)

19

14. As the Chief Deputy Warden, defendant Gower would have served as Warden McDonald's designee if the Warden had been unavailable.  (Gower Decl. ¶ 5.)

15. Although Warden McDonald was not unavailable at any time during the "Two-Five" Modified Program, defendant Gower did serve as the Warden's designee on occasion for the limited purpose of signing documents on his behalf.  (Gower Decl. ¶ 5.)

16. However, Warden McDonald maintained the sole authority to begin, end, or adjust the terms of the "Two-Five" Modified Program.  Gower did not serve as Warden McDonald's designee for this purpose and never had the authority to begin, end, or adjust the terms of the "Two-Five" Modified Program.  (Gower Decl. ¶ 5.)

**D. Correctional Captain Davey**

17. From the initiation of the modified program on September 18, 2009, through December 22, 2009, defendant Davey was the Correctional Captain for Facility B at HDSP. (Davey Decl. ¶ 1.)

18. As Facility Captain for Facility B, Captain Davey served as a member of the Warden's executive committee until his promotion on December 22, 2009.  However, Davey had no authority to begin, end, or adjust the terms of the "Two-Five" Modified Program. (Davey Decl. ¶¶ 4, 7.)

19. Captain Davey consulted with Warden McDonald and other members of the committee regarding the "Two-Five" Modified Program.  Davey provided Warden McDonald daily briefings regarding the status of the "Two-Five" Modified Program and updated him on the investigation as new intelligence information was discovered. (Davey Decl. ¶ 4.)

20. Upon his promotion on December 22, 2009, Captain Davey became responsible for overseeing custody operations for Complex II, which is composed of Facilities C and D, as well as in the institution's administrative segregation unit (Facility Z).  (Davey Decl. ¶ 5.)

21. After December 22, 2009, Captain Davey was not involved in any aspect of the "Two-Five" Modified Program.  (Davey Decl. ¶ 5.)

**E. Lieutenant Van Leer**

22. At all relevant times, Defendant Van Leer was a Correctional Lieutenant assigned to HDSP Prison's Facility B.  (Van Leer Decl. ¶ 2.)

23. As Second Watch Lieutenant for Facility B, Lt. Van Leer attended numerous threat assessment meetings and provided briefing to the Facility B Captain.  However, he never directly briefed Warden McDonald in person.  (Van Leer Decl. ¶ 9, 10.)

24. Lt. Van Leer also drafted memorandum addressed to Warden McDonald in which he apprised the Warden of the status of the investigation and updated him on efforts to return to normal programming.  (Van Leer Decl. ¶ 11.)

25. Although Lt. Van Leer was responsible for implementing the Warden's policies concerning the "Two-Five" Modified Program, he did not have the authority to begin, end, or adjust the terms of the modified program once it had been implemented.  (Van Leer Decl. ¶ 12-14.)

**F. Correctional Counselor Sanders**

26. At all relevant times, defendant Sanders was employed by CDCR as a Correctional Counselor I at HDSP.  (Sanders Decl. ¶ 1.)

27. During the "Two-Five" Modified Program Sanders was the counselor for those inmates identified as being members or associates of the "Two-Five" disruptive group.  (Sanders Decl. ¶ 4.)

28. Correctional Counselor Sanders had no decision-making authority in regards to the "Two-Five" modified program and had no authority to assist plaintiff or to alter the status of plaintiff's confinement under the "Two-Five" Modified Program.  (Sanders Decl. ¶¶ 5-17.)

**G. Correctional Counselor Domondon**

29. At all relevant times, defendant Domondon was employed by CDCR as a Correctional Counselor I at HDSP.  (Domondon Decl. ¶ 1.)

30. During the "Two-Five" Modified Program Domondon was the counselor for those inmates identified as being members or associates of the "Two-Five" disruptive group.

21

1        (Domondon Decl. ¶ 4)

2     31. Correctional Counselor Domondon had no decision-making authority in regards to the

3        "Two-Five" modified program and had no authority to assist plaintiff or to alter the

4        status of his confinement under the "Two-Five" Modified Program.  (Domondon Decl.

5        ¶¶ 5-15, 25.)

6     **II. HIGH DESERT STATE PRISON AND FACILITY B SENSITIVE NEEDS**

7  **YARD**

8     32. HDSP is a Level IV, maximum security prison.  The majority of inmates housed at

9        HDSP are Level IV inmates who are believed to pose the greatest threat to

10       institutional safety and security.  (McDonald Decl. ¶ 16.)

11    33. Level IV prisons house the most violent and dangerous felons.  Level IV prisons have

12       a secure perimeter with internal and external armed coverage and housing units with

13       cells that are not adjacent to exterior walls.  (McDonald Decl. ¶ 17.)

14    34. HDSP is made up of two complexes:  Complex One and Complex Two.  Complex

15       One consists of Facilities A and B.  Complex Two consists of Facilities C and D.

16       (McDonald Decl. ¶ 18.)

17    35. Each facility is self-contained and built around a yard where inmates are allowed to

18       exercise daily, unless unusual circumstances require otherwise.  (McDonald Decl. ¶

19       19.)

20    36. Facility B is comprised of five identical housing units (B1 through B5), each

21       containing 100 cells, and a gymnasium, which also was used to house inmates.

22       During 2009, HDSP's Facility B housed approximately 1,100 Level IV sensitive

23       needs inmates.  (McDonald Decl. ¶ 20.)

24    37. Facility B is a designated Sensitive Need Yard.  Sensitive Need Yards were

25       established to provide protective housing for inmates that could not safely program on

26       a general population yard.  An inmate was typically placed on a Sensitive Needs Yard

27       for reasons that may have made him a target of violence at the hands of other inmates.

28       An inmate may be placed on a Sensitive Needs Yard based on his commitment

offense, medical needs, age, or status as a gang dropout.  (McDonald Decl. ¶ 21.)

38. Despite the intent to provide more protective housing, the Sensitive Needs Yard at HDSP often presented equal, if not greater, problems, including violence, than the general population yards.  (McDonald Decl. ¶ 22.)

39. This is because HDSP's Sensitive Needs Yard was composed of a diverse mix of inmates.  Many were former members of rival prison or street gangs.  Many of these former gang members were ruthless killers who had previously sworn to kill members of rival gangs or known sex offenders on sight.  (McDonald Decl. ¶ 23.)

40. On a general population yard, these rival gangs tended to self-segregate and each gang typically had its own "turf."  (McDonald Decl. ¶ 24.)

41. Most inmates placed on a Sensitive Needs Yard attempted to program non-violently. Nonetheless, given the mix of inmates, if tensions arose, it was often very difficult for custody staff to manage those tensions.  (McDonald Decl. ¶ 25.)

**III. BACKGROUND ON MODIFIED PROGRAMMING**

42. Normal programming within the prison is optimal.  Normal programming means the inmates attend work and education programs; have regular visiting, canteen and telephone privileges; are allowed to attend the law library and religious services; and are released to the yard for recreation in large groups according to their yard schedules.  (McDonald Decl. ¶ 26.)

43. A modified program typically involves the suspension of various programs or services for a specific group of inmates and/or in a specific portion of a facility.  For example, work and education programs might be suspended; telephone, canteen, or visiting privileges might be restricted; and meals may be delivered to the cells instead of being served in the dining hall.  These programs and privileges are restored incrementally as the administration deems appropriate based on the concern with maintaining safety and institutional security.  (McDonald Decl. ¶ 27.)

44. In contrast, a lockdown typically involves the restriction of all inmates to their cells or dormitory beds, the suspension of all programs, and the suspension of all but essential

functions.  Lockdowns can be imposed on the entire prison or on a specific facility within the prison.  Inmate movement is strictly controlled, under close supervision, and generally under escort with mechanical restraints.  The administration determines whether critical inmate workers in the affected housing units should be permitted to attend their work assignments.  Inmates are only released on a case-by-case basis. (McDonald Decl. ¶ 28.)

45.  CDCR policies and procedures provide that whenever there is a serious incident, the priorities are as follows:  (1) isolate, contain, and control the situation to the smallest possible area; (2) provide medical attention to all injured persons; (3) preserve all available evidence; (4) identify all involved persons; and (5) complete and submit appropriate written documentation and reports within the designated time frames. (McDonald Decl. ¶ 30.)

46.  During a modified program, the warden communicates with staff and the affected inmate population through periodic reports, called Program Status Reports ("PSRs").  Part B of PSRs updated all interested parties about the status of the modified program, and the PSRs communicated the warden's plans for returning to normal programming as soon as it is safe to do so.  PSRs reflect the warden's instructions for how the modified program is to be implemented, and subordinate staff is not free to deviate from these instructions.  (McDonald Decl. ¶ 31.)

47.  When staff learns of a threat to institutional safety and security, after the initial incident response is completed and the situation stabilized, the incident is assessed to determine whether it is necessary to modify or restrict programming activities for some or all inmates.  This happens as follows:  after a precipitating event, the lockdown committee meets and assesses the overall safety and security risk, and it determines what areas of the prison are affected, which investigations must be conducted, whether to interview staff and inmates, and how to collect relevant intelligence.  (McDonald Decl. ¶ 32.)

48.  If the incident is serious, it may be necessary to modify or restrict program activities

for some or all inmates by: (1) declaring a State of Emergency; (2) locking down an entire facility or portions of a facility; or (3) placing some or all of the facility on a modified program.  The lockdown committee submits a recommendation to the warden, which may include a request to institute any one of these three security measures, and the warden, or his or her designee, approves or rejects the recommendation.  (McDonald Decl. ¶ 33.)

49. If a modified program is implemented in any form, it is assigned a Program Status Number.  It is referred to by this number in all related documents thereafter.  The modified program at issue in this case was assigned Program Status Number HDP-B-09-025.  (McDonald Decl. ¶ 34.)

50. At any time, a facility or housing unit can be operating under more than one modified program, each of which is designed to address a specific security risk.  For instance, a housing unit could be operating under two separate modified programs at the same time — in this case one affecting suspected "Two-Five" members and the other affecting the remaining population.  (McDonald Decl. ¶ 35.)

51. CDCR implements lockdowns and modified programs when they are necessary to maintain safety and security in the prisons, and to protect the lives of inmates and staff.  Decisions to implement a lockdown or modified program are usually based on numerous situation-specific facts. (McDonald Decl. ¶ 36.)

52. Only by evaluating incidents on a case-by-case basis can prison officials determine when a prison must be locked down or a group of inmates placed on a modified program; when normal programs, including outdoor exercise, should be suspended for particular inmates; or when and how normal programming can be safely resumed. (McDonald Decl. ¶ 37.)

53. Setting the parameters of the group of inmates subject to modified programming is always situation-specific.  The intention is to be neither under-inclusive nor over-inclusive, but to set the limit necessary to facilitate investigational tasks, and implement measures best designed to ensure the safety and security of the prison's

staff, its inmates, and the institution as a whole, without needlessly interrupting the programming of inmates who were not involved.  (McDonald Decl. ¶ 38.)

54. CDCR's policy requires a return to normal programming as soon as it is safe to do so. Gathering information about the cause(s) of violence, any significant security breaches that have occurred, or the plans for committing acts of violence, is imperative so that prison staff can determine how and when to resume normal programming and avoid further incidents.  (McDonald Decl. ¶ 39.)

55. Once custody staff identifies the inmates who instigated the incident, those inmates are removed from the general population, and the Warden determines it is safe to resume normal programming, a phased unlock may begin.  (McDonald Decl. ¶ 40.)

56. An unlock plan is developed by the Warden and his staff to return to full programming. During the phased unlock, inmates are released, and privileges restored, in stages.  (McDonald Decl. ¶ 41.)

57. It is more difficult, labor intensive, and expensive to operate a prison during a modified program.  Typically, during normal programming, inmates assist staff as part of their work assignments, and they are allowed to report to the showers and some medical appointments without an escort.  During a modified program, correctional staff must deliver all meals to each inmate's cell, most work assignments are suspended, and inmates must be escorted to showers and medical appointments.  In addition, correctional staff is diverted from their regular responsibilities to assist in the investigation of the underlying incident.  (McDonald Decl. ¶ 42.)

**IV. PROCEDURES RELATED TO INVESTIGATION OF INCIDENT**

58. Once a modified program is implemented, the process of investigating and gathering intelligence begins.  The investigation process can be slow, time-consuming, and labor intensive.  Inmates and facility staff are interviewed by Institution Gang Investigators ("IGI") and custody staff to gather intelligence about the incident and to determine whether it is safe to return to normal programming.  Inmates must often be interviewed more than once because they are reluctant to speak with or disclose

26

information to correctional staff.  As tensions begin to ease and as the modified program and attendant restrictions continue, inmates become more willing to cooperate with correctional staff.  (McDonald Decl. ¶ 43.)

59. The yards, cells, common areas, and other areas of the prison are searched thoroughly for evidence, weapons, and contraband.  Mail is screened for any information concerning planned violence.  Each piece of evidence and information obtained from either a search or interview is examined and all leads are followed, which often creates the need for additional searches and interviews.  (McDonald Decl. ¶ 44.)

60. The investigation process is delayed when weapons are discovered during the searches.  The discovery of weapons creates additional issues that must be evaluated, including but not limited to, where the weapons came from, how they were made, when they were gathered, and their intended targets.  (McDonald Decl. ¶45.)

61. If another incident occurs during the unlock process, the warden may rescind previously restored programs so an investigation of the new incident can be completed.  If it is determined that returning the inmates to normal programming would pose too great a risk, the warden may continue the modified program.  While some of the evidence gathered during the prior investigation may be helpful, prison officials need to conduct a new investigation and assess the nature, scope, and duration of the most recent threat to safety and institutional security.  (McDonald Decl. ¶ 46.)

62. It may take several weeks, or sometimes months, to complete the necessary interviews, searches, and investigations.  This time frame may be extended if critical information is discovered or leads are developed requiring further investigation.  Further delays will also occur if there are other incidents.  (McDonald Decl. ¶ 47.)

63. The fact that an inmate was not housed in a particular housing unit where the precipitating event occurred does not change the fact that every inmate falling within the scope of the modified program is subject to investigation.  (McDonald Decl. ¶ 48.)

**V. THE PHASED RETURN TO NORMAL PROGRAMMING**

64. CDCR's policy is to return to full normal programming as soon as it is safe to do so.

27

(McDonald Decl. ¶ 49.)

65. To that end, the warden requests that his staff develop an unlock plan for releasing the affected inmates back to normal programming.  An unlock plan depends on the nature of the incident and is developed on a case-by-case basis.  Thus, the return to full program activities will be undertaken in phases, depending on the magnitude and dynamics of the incident.  The resumption of normal program activities is planned and implemented during normal business hours when the majority of regularly scheduled staff are present and have been briefed on the plan of operation.  (McDonald Decl. ¶ 50.)

66. Generally, small numbers of inmates are released initially, and critical inmate workers are often the first to be released.  The number of inmates who are released is increased over time, but only when it is deemed safe to do so.  After inmates with priority work assignments are released, their privileges are restored incrementally.  (McDonald Decl. ¶ 51.)

67. The remaining inmates are included in incremental releases and return to their full programming.  Generally, non-involved groups are released first, followed by those involved in the incident based on their gang and disruptive group affiliations.  (McDonald Decl. ¶ 52.)

68. Inmates are released in small groups to the day room and the recreation yard, where staff have the opportunity to observe their conduct in a controlled environment, thereby providing a means to evaluate whether the unlock can proceed safely.  (McDonald Decl. ¶ 53.)

69. During the unlock process, program activities such as telephone calls, canteen and quarterly packages are restored incrementally as well.  (McDonald Decl. ¶ 54.)

70. If another incident occurs during the unlock process, it may be necessary to lockdown inmates who were previously released so an investigation of the new incident can be completed.  (McDonald Decl. ¶ 55.)

/////

28

**VI. RESTRICTIONS ON EXERCISE DURING A MODIFIED PROGRAM**

71. Among all of the programming activities that are suspended during a modified program, it is most difficult to determine when exercise programs can safely be resumed.  In Warden McDonald's experience violence is most likely to occur on an exercise yard following a phased unlock.  Inmates have the greatest access to each other on the exercise yards, which is typically where most assaults occur.  The number of inmates on a yard greatly outnumbers the correctional staff members assigned to monitor the area.  (McDonald Decl. ¶ 56.)

72. The safety and security of the institution, staff, and inmates, takes precedence over all other considerations.  Striking the right balance between ensuring institutional security and the safety of staff and inmates, and returning inmates to regular exercise and normal programming as soon and as safely as possible is difficult.  (McDonald Decl. ¶ 57.)

73. In 2009-2010, there were numerous factors that Warden McDonald considered when deciding how and when to safely resume outdoor exercise after the "Two-Five" Modified Program had been implemented.  Warden McDonald believed that every modified program should end as quickly as is safely possible.  But the consequences for failing to impose a modified program or ending one prematurely can be dire. (McDonald Decl. ¶ 57.)

74. The risk associated with lifting modified programming prematurely, is that further incidents of violence can occur.  Unfortunately this was the experience on Facility B, as the September 17, 2009 attacks occurred approximately a week after Facility B returned to normal programming following another attempted murder.  Given that experience, Warden McDonald was particularly cautious about lifting "Two-Five" Modified Program prematurely.  (McDonald Decl. ¶ 58.)

75. Plaintiff claims that he should have been allowed to use the small concrete yards for exercise during "Two-Five" Modified Program.  This was not feasible and could not be allowed for several reasons.

a. First, from the time that HDSP opened in 1995, to present, the concrete yards have never been used for general population or Sensitive Needs Yard programming; they were only designed for, and have only been used by, Administrative Segregation Overflow and Security Housing Unit inmates.

b. Second, the concrete yards could safely accommodate only approximately 10 to 20 prisoners at a time.  Devoting custodial staff to evaluating, selecting, escorting, and supervising such small groups would significantly impede and delay investigations, thereby lengthening the time that all inmates would be deprived of exercise on the main yard and other programming activities.

c. Third, placing up to twenty Level IV inmates in an enclosed space the size of a basketball court could have been disastrous.  If an inmate were assaulted in one of the enclosed concrete yards, he would have no means of escape; he would be trapped. Putting ten to twenty inmates in such a situation exposed them to an unreasonable risk of harm.

d. Fourth, the "Two-Five" group was engaged in a concerted and coordinated effort to murder all sex offenders on Facility B.  Providing the "Two-Five" members an opportunity to meet and make further plans would have undermined one of the main reasons for placing them on modified program in the first place, which was to prevent them from planning and carrying out further violence.  (McDonald Decl. ¶ 59.)

**VII. THE MODIFIED PROGRAM WAS NECESSARY IN TIME AND SCOPE**

76. While portions of the modified program at issue applied only to specific groups of inmates, these restrictions were not arbitrary.  Based on the information Warden McDonald was provided, he believed that:  (1) there were unknown numbers of unidentified inmates involved; (2) the investigators had properly identified the target groups of inmates (i.e. "Two-Five" members or associates housed on Facility B); (3) the only way to ensure the safety of staff and inmates and the security of the institution was to remove or isolate this target group; and (4) the consequences for failing to act would have been dire.  (McDonald Decl. ¶ 60.)

77. All restrictions imposed on inmate access to the main exercise yards during modified programming were imposed with the belief that the restrictions would be effective in preventing further acts of violence, and would help to restore order.  (McDonald Decl. ¶ 61.)

78. Warden McDonald repeatedly instructed his staff that his objective was to return to normal programming as soon as it was safe to do so.  He believed that his staff worked diligently to achieve that objective.  (McDonald Decl. ¶ 62.)

79. Knowing when and how to return to regular programming after an incident is a difficult and delicate decision.  The restrictions placed on outdoor exercise during the modified program at issue were based on considerations of the safety and security of the institution, staff, inmates, and the public, and Warden McDonald's intent was always to return the affected inmates to regular programming as soon as was safely possible.  (McDonald Decl. ¶ 63.)

80. As each investigation progressed, Warden McDonald developed a plan to release all affected inmates from the restriction of the modified program as soon as he determined it was safe to do so, and when he believed that it was safe to restart normal programming activities, based on all the information provided to him by prison staff, he implemented a gradual, calculated release based on those restrictions.  (McDonald Decl. ¶ 63.)

81. Based upon the reports Warden McDonald received, he and his staff believed that the modified program at issue:  (1) was necessary to protect the lives of correctional staff and inmates because of significant and credible threats of continued violence; (2) was a response to severe and unusually high levels of violence on Facility B; (3) was designed solely to protect the lives and safety of inmates and correctional staff members whom the warden believed were in imminent danger of violent assaults; (4) did not last any longer than was necessary to protect the lives and safety of inmates and correctional staff; (5) was not intended to prejudice or harass anyone; and (6) did not violate any statutory or constitutional rights.  (McDonald Decl. ¶ 66; Gower Decl.

31

¶ 17, Davey Decl. ¶ 8, Van Leer Decl. ¶ 18.))

82. Warden McDonald's belief was supported by the marked decrease in violence on Facility B as the "Two-Five" Modified Program progressed and inmates identified as "Two-Five" members were removed from the Sensitive Needs population. (McDonald Decl. ¶ 65.)

**VIII. THE 2009-2010 MODIFIED PROGRAM ON FACILITY B AT HDSP**

83. Prior to the institution of the modified program that is the subject of this lawsuit (the "Two-Five" Modified Program), there were a number of violent incidents on Facility B at HDSP, including multiple attempted murders. Much of this violence involved the use of inmate manufactured weapons. (Defs.' Exs. A-42, D & E.)

84. A majority of this violence was directly attributed to the "Two-Five" disruptive group. (Defs.' Ex. A-42.)

85. When it was discovered that metal had gone missing, Facility B was placed on modified program from February 18, 2009, through March 10, 2009. (Defs.' Ex. D-1.)

86. In early April, there was an attempted murder on Facility B, leading the Warden to place Facility B on Modified Program from April 6, 2009, through May 17, 2009. (Defs.' Ex. D-1.)

87. On July 1, 2009, Facility B was placed on modified program following threats made towards staff. Facility B returned to normal program on July 16, 2009. (Defs.' Ex. D-1.)

88. On July 7, 2009, an inmate attacked his cellmate with an inmate manufactured weapon. The victim sustained several abrasions and lacerations to his face. (Defs.' Ex. E-1.)

89. On July 10, 2009, two inmates attacked another inmate during evening meal. The victim was stabbed with a paper clip. (Defs.' Ex. E-2.)

90. On July 20, 2009, one inmate attacked another during morning yard. Using his fists, the assailant inflicted a laceration under the victim's eye that required six sutures to

32

close.  (Defs.' Ex. E-3.)

91. On July 30, 2009, five inmates attempted to murder another inmate during the release for morning meal.  At that time officers recovered three inmate manufactured weapons that were used during the attempted murder.  The victim suffered a number of lacerations and puncture wounds, which required sutures and staples to close.  (Defs.' Ex. E-4.)

92. The Warden placed the facility on modified program on July 31, 2009.  The modified program was lifted, approximately six weeks later, on September 9, 2009.  (Defs.' Ex. D-1.)

93. On September 17, 2009, a week after Facility B returned to normal programming, there was a third attempted murder, which led to the implementation of the "Two-Five" Modified Program. (Defs.' Ex. D-2.)

94. Following the third attempted murder, officials at HDSP began the process of having the "Two-Five" group officially recognized as a prison gang or disruptive group. (McDonald Decl. ¶ 8.)

95. To this end, officials at HDSP were in close contact with CDCR headquarters throughout the resulting modified program and investigation of "Two-Five" activities on Facility B.  (McDonald Decl. ¶ 8.)

96. Although the "Two-Five" were not designated as a prison gang or disruptive group by CDCR at that time, efforts to do so demonstrate how serious a threat prison officials believed the "Two-Five" were to institutional security.  The "Two-Five" have since been identified as a "Security Threat Group II" under CDCR's recently implemented policies.  (McDonald Decl. ¶ 9.)

**IX. SEPTEMBER 17, 2009: ATTEMPTED MURDERS OF THREE INMATES**

97. One of the most serious incidents leading to the modified program occurred on September 17, 2009, when three members of the "Two-Five" group assaulted inmates on the Sensitive Needs Yard.  (Defs.' Ex. A-1.)

98. On September 17, 2009, two coordinated stabbing incidents occurred simultaneously

on opposite ends of the Facility B main exercise yard.  The attacks were coordinated in such a way that they diverted custody's response to opposite ends of the yard, providing the assailants time to inflict the maximum amount of damage.  (Defs.' Ex. A-1.)

99. Three Hispanic inmates, who were associated with the "Two-Five" group, stabbed three Mexican National inmates.  All three assailants used inmate manufactured weapons, and all victims suffered serious injuries.  (Defs.' Ex. A-1.)

100.    Two of the victims were transported via air ambulance to outside hospitals and the third was transported to an outside hospital by ambulance.  (Defs.' Ex. A-1.)

101.    Through subsequent investigation, custody staff learned from multiple sources that the attacks were part of a coordinated effort by the "Two-Five" group to systematically murder and remove sex offenders from Facility B.  (Defs.' Ex. A-7.)

102.    Information discovered through the investigation indicated that the "Two-Five" group would continue to attack sex offenders every time Facility B returned to normal programming until they were transferred to another institution.  (Defs.' Ex. A-42.)

**A. Initiation of Modified Program and Investigation of Incident**

103.    As a result of this incident, all inmates on Facility B were placed on modified programming on September 18, 2009 (the "Two-Five" Modified Program).  (Defs.' Ex. A-3.)

104.    During the "Two-Five" Modified Program, the central files of all inmates were reviewed to determine gang or disruptive group affiliation, whether the inmate had a history of violence, and the suitability of that inmate remaining in the Sensitive Needs Yard setting.  (Defs.' Ex. A-1.)

105.    The investigation included interviews and searches of the entire inmate population on Facility B as well as the entire facility itself.  (Defs.' Ex. A-1.)

106.    During the investigation, custody staff specifically attempted to identify those inmates who were affiliated with the "Two-Five" group.  (Defs.' A-5.)

107.    Given the severity of the September 17 attack, custody staff believed it was

34

imperative that inmates identified as being affiliated with the "Two-Five" group were isolated from the remainder of the inmate population on Facility B.  (Defs.' Ex. A-5.)

108.    On October 6, 2009, all inmates identified as being members or associates of the "Two-Five" group were removed from their cells and escorted to the Facility B dining hall.  (Defs.' Ex. A-5.)

109.    In the dining hall, IGI photographed the inmates to document any gang-related tattoos and conducted interviews to determine any gang affiliation.  (Defs.' Ex. A-5.)

110.    While these inmates were held in the dining hall, correctional officers searched their cells and removed all property.  (Defs.' Ex. A-5-6.)

111.    Each inmate's property was catalogued and searched for anything that would indicate gang affiliation.  (Defs.' Ex. A-5.)

112.    Inmates not affiliated with the "Two-Five" group were removed from Facility B, Building 2, Section C and re-housed in another unit.  (Defs.' Ex. A-5.)

113.    Inmates identified as being members of the "Two-Five" group, were separated from other Facility B inmates and placed in housing Building 2, Section C, where they remained on Modified Program status. (Defs.' Ex. A-5.)

**B. Plaintiff Gomez's Inclusion in "Two-Five" Group**

114.    In a confidential memo, dated July 8, 2008, plaintiff was identified as a member of the "Two-Five" group by an inmate who claimed that he was threatened with assault by "Two-Five" members if he did not comply with their orders to pay money to the Mexican Mafia.  (Defs.' Ex. B-1–B-3.)

115.    The information provided by this inmate was deemed reliable because it was corroborated by other confidential sources, through investigation, or by information provided by a non-confidential source.  (Defs.' Ex. B-2.)

116.    Based on this information, plaintiff was housed in Facility B, Building 2, Section C with other suspected members of the "Two-Five" group.  (Defs.' Ex. A-5.)

**C. October 2009: Attempt to Return Non-"Two-Five" Inmates to Normal**

/////

35

**Programming and Subsequent Threats**

117.     On October 20, 2009, defendant Lt. Van Leer drafted a memorandum to Warden McDonald in which he indicated that Facility B supervisors believed that all inmates identified as "Two-Five" members had been removed from the remainder of the inmate population and placed in Building 2, Section C.  (Defs.' Ex. A-7-A-9.)

118.     Based on this belief, the Facility B supervisors thought that the root of the recent violence had been removed, and the remainder of the Facility B population could return to normal programming.  (Defs.' Ex. A-8.)

119.     However, on October 23, 2009, first watch staff intercepted a letter that stated, "I hear some more shit is going to go down on Monday.  So we will probably be on lockdown again."  (Defs.' Ex. A-10.)

120.     A Facility B Sergeant interviewed the inmate who authored the letter the following day.  The inmate told the Sergeant that the "Two-Five" group was going to continue "removing 'Sex Criminals' from the yard."  (Defs.' Ex. A-10.)

121.     The inmate claimed that the potential victim of a "Two-Five" group attack had raped the sister or daughter of a "Two-Five" member.  (Defs.' Ex. A-10.)

122.     As a result of that rape, the inmate was supposed to be assaulted with a weapon made of metal.  (Defs.' Ex. A-10.)

123.     The inmate also told prison officials that white inmates not affiliated with the "Two-Five"" group were planning a larger-scale attack on "Two-Five" members because the "Two-Five" attacks were affecting their programming.  (Defs.' Ex. A-10, A-42.)

124.     On October 24, 2009, a Correctional Officer overheard an inmate tell his mother on a telephone call that the facility would be back on lockdown on Monday.  (Defs.' Ex. A-10.)

125.     Prison officials conducted numerous separate interviews in which they learned of possible assaults utilizing weapons.  (Defs.' Ex. A-10.)

126.     Based on this information, Warden McDonald placed Facility B on modified

36

program on Monday October 26, 2009. (Defs.' Ex. A-12.)

**D. November 2009:  Resumption of Modified Program and Further Investigation**

127.     Beginning on November 2, 2009, prison officials began to again review inmate Central Files and conduct interviews with inmates in an effort to identify additional inmates affiliated with the "Two-Five" group.  (Defs.' Ex. A-14.)

128.     Inmates with identifying tattoos or other substantiated evidence of "Two-Five" group affiliation were re-housed in Building 2, Section C of Facility B.  (Defs.' Ex. A-14.)

129.     If no evidence of "Two-Five" group affiliation was found for a particular inmate, that inmate was required to sign an Unlock Chrono, indicating that he would not participate in gang activities and would program non-violently.  (Defs.' Ex. A-14.)

130.     The goal was to move all inmates with suspected "Two-Five" group affiliation into Building 2, Section C, while inmates with no affiliation would be housed in Buildings One, Three, Four, and Five, or in the Facility B Gym.  (Defs.' Ex. A-14.)

131.     This would ensure that these buildings and the gym would be housed only with inmates wanting a positive, non-violent program.  (Defs.' Ex. A-15.)

132.     The renewed investigation began with inmates housed in the Facility B Gym, where most of Facility B's critical workers were housed.  Critical workers are those workers that assist with the operation of the prison and include food services, laundry, and sanitation workers.  Starting in the gym would allow correctional staff to return these critical workers to work at the earliest possible time in order to alleviate some of the strain on correctional staff.  (Defs.' Ex. A-14.)

133.     Once all central files were reviewed and all inmates were interviewed, Warden McDonald's plan was that those housed in the Gym would begin Phase One of a phased return to normal programming.  (Defs.' Ex. A-14.)

134.     The investigation would then continue building by building until each housing unit was cleared of suspected "Two-Five" group affiliates.  (Defs.' Ex. A-15.)

135.     Once this was accomplished, each housing unit would receive evening dayroom on

1    a rotational basis, canteen, quarterly packages, and contact visits.  (Defs.' Ex. A-15.)

2    **E. November 12, 2009:  Threats Against Staff**

3    136.    On November 12, 2009, a member of the "Two-Five" group informed correctional

4    staff that he had been selected to assault staff.  (Defs.' Ex. A-42.)

5    137.    This inmate was directed to use an inmate manufactured key to escape his

6    handcuffs during his escort to the showers.  Once he was free from the handcuffs, he

7    was instructed to assault staff.  Based on this information, Facility B was placed on

8    modified program.  (Defs.' Ex. A-43.)

9    **F. December 1, 2009:  Phase One of the Modified Program**

10   138.    On December 1, 2009, Facility B initiated Phase One of a modified program.

11   (Defs.' Ex. A-16.)

12   139.    During Phase One, all inmates were fed meals in their cells.  (Defs.' Ex. A-16.)

13   140.    Those inmates not suspected of participation in gang activities were provided yard

14   access on a rotating basis, with one tier from a building being released at a time.

15   (Defs.' Ex. A-16.)

16   141.    During this period, there were no incidents involving the inmates released for yard.

17   (Defs.' Ex. A-16.)

18   **G. December 14, 2009:  Phase Two of the Modified Program**

19   142.    On December 14, 2009, Facility B initiated Phase Two of the modified program.

20   (Defs.' Ex. A-16.)

21   143.    During Phase Two, both tiers from a building were released for yard at the same

22   time.  One building would be released for morning yard, the next for afternoon, so that

23   Buildings One through Five and the Gym would receive yard time every third day.

24   (Defs.' Ex. A-16.)

25   144.    In addition, under Phase Two, inmates not suspected of participation in gang

26   activities received their morning meal in the dining hall, while they continued to

27   receive their evening meal in their cells.  Inmates not suspected of participation in

28   gang activities were escorted unrestrained to medical appointments.  (Defs.' Ex. A-

16.)

145.    All inmates were escorted in handcuffs for non-contact visits, could arrange for law library access, and were limited to in-cell religious study.  Inmates not suspected of gang affiliation also had access to the telephone and canteen.  (Defs.' Ex. A-16 – A-17.)

146.    During Phase Two there were no incidents that would preclude the implementation of Phase Three.  (Defs.' Ex. A-19.)

**H. December 28, 2009:  Phase Three of the Modified Program.**

147.    On December 28, 2009, Facility B initiated Phase Three of the modified program.  (Defs.' Ex. A-19.)

148.    All privileges restored during Phase One and Phase Two continued.  (Defs.' Ex. A-19.)

149.    Under Phase Three, inmates not suspected of participation in gang activities received all of their meals in the dining hall, while those suspected of gang activity received meals in their cells.  (Defs.' Ex. A-19.)

150.    All non-"Two-Five" group inmates continued to receive yard time on a rotating basis. (Defs.' Ex. A-19.)

**I. January 2010:  Threats Against Staff and Inmates, Lockdown Initiated**

151.    On January 4, 2010, written information was intercepted indicating that an inmate affiliated with the "Two-Five" group was conspiring with other inmates to assault unidentified Correctional Staff and inmates on Facility B.  (Defs.' Ex. A-22.)

152.    Secondary information was also received from other confidential sources indicating that inmates affiliated with the "Two-Five" group were attempting to recruit other inmates not currently on modified program to carry out assaults on Facility B Correctional Staff.  (Defs.' Ex. A-22.)

153.    On January 5, 2010, IGI officers interviewed the author of the note.  The author of the note indicated that his cellmate intended to assault three correctional officers.  (Defs.' Ex. A-22.)

39

154.    The author of the note also stated that he overheard his cellmate and another inmate discussing whether to assault staff or sex offenders.  (Defs.' Ex. A-26.)

155.    This second inmate was then interviewed and he stated that he had no intention to assault staff, only sex offenders.  (Defs.' Ex. A-26.)

156.    This inmate indicated that members and associates of the "Two-Five" group were still planning on carrying out assaults on sex offenders.  (Defs.' Ex. A-26.)

157.    This inmate also indicated that there was an ample amount of metal weapon stock and weapons on the yard, the targets were selected, and so were the "Two-Five" group members who were going to carry out the stabbing assaults.  (Defs.' Ex. A-26.)

158.    Based on this information, all of Facility B was placed on lockdown status on January 7, 2010, so that further investigation could occur.  (Defs.' Ex. A-27; A-43.)

159.    The investigation included extensive searching and interviewing of inmates and their housing areas.  (Defs.' Ex. A-43.)

160.    During the investigation, several additional inmates were identified as members of the "Two-Five" group.  (Defs.' Ex. A-25.)

161.    The newly identified "Two-Five" group affiliates were re-housed in Building 2, Section C with the other "Two-Five" disruptive group inmates.  (Defs.' Ex. A-25.)

162.    The searches and interviews did not lead to the discovery of any weapons or any information that would corroborate the confidential information regarding the conspiracy to assault staff and sex offenders on Facility B.  (Defs.' Ex. A-28.)

163.    Correctional staff recommended that Facility B resume the modified program at Phase Two.  The Warden implemented this recommendation on Tuesday, February 9, 2010.  (Defs.' Ex. A-28.)

**J. February 22, 2010:  Return to Phase Three and Amendment of Phase Three**

164.    On February 18, 2010, Facility B requested that Phase Three of the modified program be implemented as there had been no incidents that would preclude its implementation.  (Defs.' Ex. A-31.)

/////

165.    All inmates that had not been identified as participating in gang activity would receive their meals in the dining halls.  (Defs.' Ex. A-31.)

166.    These inmates would also have access to the canteen and to the telephone and received yard on a rotating basis.  (Defs.' Ex. A-32.)

**K. February 28, 2010:  New Threats and Facility-Wide Modified Program**

167.    On February 28, 2010, prison officials received additional information about potential future assaults from an inmate that had recently been transferred to HDSP.  (Defs.' Ex. A-34.)

168.    This inmate indicated that he had connections with the Mexican Mafia and could communicate with inmates housed in any facility within the institution.  (Defs.' Ex. A-34.)

169.    This inmate indicated that he had knowledge of staff assaults that were to take place on Facility B, D-Facility, and Unit Z.  (Defs.' Ex. A-34-A-35.)

170.    Based on this information, Facility B, D-Facility, and Unit Z were placed on modified program.  (Defs.' Ex. A-35.)

171.    An investigation determined that the threat was not credible, and the Warden returned Facility B to Phase Three of the modified program within two days.  (Defs.' Ex. A-36.)

172.    On March 2, 2010, Facility B returned to amended Phase Three of the modified program.  (Defs.' Ex. A-36.)

**L. March 9, 2010:  Phase Four of the Modified Program**

173.    On March 9, 2010, Facility B moved into Phase Four of the modified program.  (Defs.' Ex. A-39.)

174.    As of March 9, 2010, the inmate population on Facility B, excluding those associated with the "Two-Five" group, had successfully completed Phase Three of the modified program without any further incidents of violence.  (Defs.' Ex. A-39.)

175.    At this point, Facility B Staff had identified and removed all inmates suspected of being associated with the "Two-Five" disruptive group from the remainder of the

inmate population on Facility B.  (Defs.' Ex. A-39.)

176.    During Phase Four, the yard program consisted of a rotating schedule that allowed inmates on modified program yard time every third day.  The dayroom program consisted of a rotating schedule that provided inmates dayroom access two times during a three day period.  (Defs.' Ex. A-39.)

177.    Facility B staff and IGI continued their investigation into the actions, activities, and membership of inmates in the "Two-Five" disruptive group.  (Defs.' Ex. A-43.)

178.    Through this investigation, Facility B staff and IGI sought to gather information that would allow them to validate the inmates identified as members of the "Two-Five" disruptive group.  (Defs.' Ex. A-43.)

**M. May 17, 2010:  Conclusion of the Investigation**

179.    On May 17, 2010, Facility B Staff and the IGI completed the investigation regarding threats to inmates and staff on Facility B by the "Two-Five" group.  (Defs.' Ex. A-43.)

180.    Since the inmates identified as "Two-Five" members had been placed on modified program on Facility B, inmate violence on Facility B was significantly reduced. (Defs.' Ex. A-43.)

181.    By Monday May 17, 2010, IGI Staff were able to identify sixteen inmates perpetuating the unrest and disruption, twenty-nine inmates with ties or association with these inmates, and a preliminary list of eleven inmates with no association. (Defs.' Ex. A-44.)

182.    IGI Staff and Supervisors continued to investigate the inmates in question and monitor their activities to determine any gang, violent, or disruptive activity.  (Defs.' Ex. A-44.)

183.    On Tuesday, May 18, 2010, Facility B Staff placed all sixteen inmates identified as perpetuating the unrest into Administrative Segregation.  (Defs.' Ex. A-44.)

/////

/////

42

**N. May 19, 2010:  Return of Non-Affiliated Inmates to Normal Programming**

184.    On May 19, 2010, Facility B staff began to return those inmates identified as having little or no apparent association with the "Two-Five" group to normal programming. (Defs.' Ex. A-44.)

185.    On May 24 and May 25, 2010, Facility B Correctional Counseling Staff interviewed nineteen inmates who were identified as having some ties to the "Two-Five" group.  (Defs.' Ex. A-44.)

186.    Each of these inmates stated their willingness to positively program and to not participate in any gang, violent, or illegal activities.  In addition, they all signed the CDCR-128-B Unlock Chrono, documenting this willingness.  (Defs.' Ex. A-44.)

187.    Plaintiff Gomez signed an Unlock Chrono on or about May 24, 2010, and was returned to normal programming the following day.  (Defs.' Ex. C.)

**X. DISTRIBUTION OF PERSONAL HYGIENE ITEMS AND CELL TEMPERATURE CONTROLS**

188.    Between October 6, 2009, and October 9, 2009, all inmates, including plaintiff Gomez, who had been rehoused as part of the Modified Program, were provided with personal hygiene items, including tooth powder and laundry items.  (Amrein Decl. ¶¶ 3-6, Defs.' Ex. M.)

189.    Additionally, inmates on the IAC confirmed that all inmates had been given "supplies in accordance with the procedures established in the housing units." (Amrein Decl. ¶¶ 3-6, Defs.' Ex. N.)

190.    In the wintertime, which is designated as beginning November 1 and continuing through April of the next year, all buildings at HDSP, including Facility B are maintained at sixty-eight (68) degrees.  This temperature is maintained pursuant to the directive by the Governor of the State of California.  (Wilkerson Decl. ¶ 3.)

191.    If a cell, or any section of the building has an issue with the temperature, such as the cell or section getting too cold or too hot, the Engineer assigned to Facility B, would receive a call for service, and would go to the facility to diagnose the source of

1    the temperature variation, and correct the problem, which could include replacement

2    of parts.  (Wilkerson Decl. ¶ 4.)

3    192.    From October 6, 2009, through May 26, 2010, there was one call for service from

4    Facility B, Building 2, for cell 150 on November 19, 2009.  The problem with the

5    temperature in that cell was investigated and corrected by November 24, 2009.

6    (Wilkerson Decl. ¶ 5-7; Ex. P.)

7    193.    During the summer months, which conclude on October 31, HDSP facilities are

8    required to maintain daily temperature logs of the buildings.  These logs recorded the

9    daily temperature in each building in Facility B and show that Facility B, Building 2

10   was maintained at temperatures between 71 – 73 degrees from October 6, 2009

11   through October 31, 2009.  (Wilkerson Decl. ¶ 8-9; Ex. Q.)

12   194.    There were no other calls for service from October 6, 2009, through May 26, 2010,

13   which indicates that Facility B had no temperature-related problems, and the building

14   was maintained at 68 degrees pursuant to the Governor's directive.  (Wilkerson Decl.

15   ¶ 10.)

16   195.    From October 6, 2009, through May 26, 2010, plaintiff Gomez was housed in

17   Facility B, Building 2, cell 246 and thereafter was housed in cell 205.  (Amrein Decl. ¶

18   2-4; Ex. O.)

19   **XI. DEFENDANT SANDERS' LIMITED CONTACT WITH PLAINTIFF GOMEZ**

20   196.    As part of her duties and to preserve plaintiff's endorsement for transfer, defendant

21   Sanders prepared an extension of the endorsement for plaintiff's transfer.  She did this

22   to ensure that once plaintiff was released from modified program, he would still be

23   able to transfer to another prison without having to request another transfer. (Sanders

24   Decl. ¶ 20.)

25   197.    Defendant Sanders does not recall receiving any request from plaintiff regarding

26   an Olsen review of his central file, nor does she recall any contact with plaintiff.

27   (Sanders Decl. ¶ 21.)

28   /////

44

**XII. DEFENDANT DOMONDON'S LIMITED CONTACT WITH PLAINTIFF**

198.    On May 24, 2010, defendant Domondon met with plaintiff Gomez for the sole purpose of providing him documentation to sign, attesting to plaintiff's promise not to associate with, engage with or be a member of the "Two-Five" disruptive group. (Domondon Decl. ¶ 19; Defs.' Ex. C.)

199.    Domondon met with plaintiff again on July 2, 2010, for the sole purpose of affording him a review of his central file for an <u>Olsen</u> review.  (Domondon Decl. ¶ 20.)

200.    On July 2, 2010, plaintiff Gomez requested to view and obtain copies of documents relating to his association with the "Two-Five" disruptive group, which were contained in the section marked "Confidential" in his central file.  (Domondon Decl. ¶ 21.)

201.    As a correctional counselor, Domondon does not have the authority to allow an inmate to view or receive copies of documents contained the "Confidential" section of an inmate central file, including plaintiff, and she advised plaintiff of this and documented it in the 128B General Chrono.  (Domondon Decl. ¶ 22; Defs.' Ex. L.)

202.    Domondon did not at any time tell plaintiff that:  1) there was nothing in his central file to indicate he was a "Two-Five" group member or 2) that he must have made someone very angry to be placed in administrative segregation for eight months. (Domondon Decl. ¶ 23.)

203.    Plaintiff was not placed in administrative segregation from October 6, 2009, to May 26, 2010.  He was placed in Facility B, on Modified Program.  (Domondon Decl. ¶ 24.)

**ANALYSIS**

In resolving cross-motions for summary judgment, the court must consider each party's evidence.  See <u>Johnson v. Poway Unified School District</u>, 658 F.3d 954, 960 (9th Cir. 2011). Because in this case plaintiff will bear the burden of proof at trial on his claims, in order to prevail on summary judgment he must affirmatively demonstrate that based upon the undisputed

45

1   facts no reasonable trier of fact could find other than for him.  See Soremekun v. Thrifty Payless,

2   Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Because defendants do not bear the burden of proof at

3   trial, in moving for summary judgment they need only prove an absence of evidence to support

4   plaintiff's case.  See Oracle Corp., 627 F.3d at 387.

5          Below, the court will address the merits of the parties' cross-motions for summary

6   judgment on plaintiff's Fourteenth Amendment and Eighth Amendment claims.  Based on all of

7   the evidence presented in connection with the pending cross-motions for summary judgment, and

8   for the reasons stated below, the undersigned concludes that plaintiff's motion for summary

9   judgment should be denied, and defendants' motion for summary judgment should be granted.

10  I. Fourteenth Amendment

11         First, the court will address the parties' cross-motions for summary judgment with respect

12  to plaintiff's Fourteenth Amendment claims.  As to plaintiff's motion for summary judgment, the

13  court finds that plaintiff has failed to establish beyond dispute that the defendants denied him his

14  procedural due process rights in violation of the Fourteenth Amendment.  Specifically, plaintiff

15  contends that his conditions of confinement between October 6, 2009, and May 26, 2010, were

16  not part of defendants' "modified program."  (Pl.'s Opp'n to Defs.' Mot. for Summ. J./Cross-Mot.

17  for Summ. J. at 57 & Pl.'s SDF 204.)  In this regard, plaintiff maintains that prison officials

18  segregated him and other alleged "Two-Five" group members in administrative segregation or an

19  SCU/SPSU, and therefore, he was entitled him to procedural due process protections.  (Id.)

20         However, the evidence presented by plaintiff on summary judgment fails to establish that

21  he had a protected liberty interest in avoiding his challenged confinement.  See Wilkinson, 545

22  U.S. at 221.  Other judges of this court recently addressed a case in which a plaintiff's cellmate

23  asserted a similar challenge to his conditions of confinement during the same time period at issue

24  here while prison officials investigated the plaintiff's alleged membership in the "Two-Five"

25  group.  See Mitchell v. Cate, No. 2:11-cv-1240 JAM AC P, 2014 WL 4081763 at *1 (E.D. Cal.

26  /////

27  /////

28  /////

Aug. 19, 2014), <u>adopted by</u> 2014 WL 5472781 (E.D. Cal. Oct. 22, 2014).[4]  In that case, plaintiff

Mitchell claimed that his placement in punitive administrative segregation without notice or a

hearing violated his right to due process under the Fourteenth Amendment.  <u>Id.</u>  Mitchell filed a

motion for summary judgment arguing that he had a liberty interest in avoiding those restrictive

conditions during his segregation.  <u>Id.</u> at *7.

Disagreeing, the court held that Mitchell had failed to establish that he was "placed in

administrative segregation as a disciplinary measure absent due process, rather than subject to

lockdown for institutional safety and security reasons as part of a group of inmates associated

with a disruptive group implicated in incidents of violence."  <u>Mitchell</u>, 2014 WL 4081763 at *7.

The court acknowledged that prison officials had not provided Mitchell with a hearing within 72

hours of his segregation or his placement on modified programming.  <u>Id.</u>  In addition, the court

acknowledged that prison officials had not provided Mitchell with notice or informed him of the

reasons for his placement in segregation or on modified programming before it took place.  <u>Id.</u>

The court recognized that prison officials had not allowed Mitchell outdoor exercise for seven

months or access to the canteen, packages, or the law library.  <u>Id.</u>  Nevertheless, the court

reasoned that Mitchell had not established that "the due process requirements that apply to

individual prison disciplinary actions also apply to placement in a unit with restrictive program

modification."  <u>Id.</u>

Similarly, in this case, prison officials never afforded plaintiff a prison disciplinary

hearing nor was he found guilty of a prison disciplinary violation.  Nor did prison officials

ultimately validate plaintiff as a member of the "Two-Five" group.  Nonetheless, between

October 6, 2009, and May 25, 2010, prison officials did not allow plaintiff outdoor exercise and

other privileges.  However, as in <u>Mitchell</u>, defendants here have offered evidence in opposition to

plaintiff's motion for summary judgment demonstrating that the conditions of plaintiff's

---

[4]  In his declaration, plaintiff identifies inmate Mitchell as his cellmate.  (Gomez Decl. ¶ 21c, Pl.'s
Ex. B (group administrative appeal).)  In Mitchell's complaint he too identified Gomez as his
cellmate.  (Compl. at 9.)  Inmate Mitchell was actually being confined in his original cell because
he was one of two inmates who was already housed in the upper C section of Building 2.  (<u>Id.</u>)  It
appears from the evidence before the court that plaintiff Gomez and Mitchell were cellmates from
approximately October 6, 2009, until January 12, 2010.  (Defs.' Ex. O, Pl.'s Decl. ¶ 49.)

1    confinement (and other inmates identified as alleged "Two-Five" group members) was part of the

2    prison's modified programming and was not a placement in administrative segregation.  (Defs.'

3    Ex. A at A05.)

4         Specifically, the evidence presented by defendants on summary judgment establishes that

5    at any time a prison facility or housing unit therein can be operating under more than one

6    modified program, each of which is designed to address a specific security risk.  (McDonald

7    Decl. ¶ 35.)  Here, there were two modified programs – one affecting suspected "Two-Five"

8    group members and the other affecting the remaining prison population.  (Id.)  Prison officials

9    found it imperative to move suspected "Two-Five" members as a group to Housing Unit B-2 "to

10   allow better integrity of the investigation and to allow the rest of the inmate population to

11   positively program with minimal interference."  (Defs.' Ex. A at A42.)  Prison officials had

12   identified plaintiff as a "Two-Five" group member or affiliate based on a confidential memo,

13   dated July 8, 2008, and housed him with other suspected "Two-Five" members.  (Defs.' Ex. B-1–

14   B-3, Defs.' Ex. A-5.)

15        Although inmates identified as being "Two-Five" members were separated from other

16   Facility B inmates, defendants' evidence shows that those "Two-Five" members remained on

17   modified program status.  (Defs.' Ex. A-5.)  To be sure, portions of the modified program at issue

18   applied only to specific groups of inmates, but the restrictions were not arbitrarily imposed.

19   Based on the information Warden McDonald had received, he believed that:  (1) there were

20   unknown numbers of unidentified inmates involved in the recent violent events within the prison;

21   (2) the investigators had properly identified the responsible groups of inmates (i.e. "Two-Five"

22   members or associates housed on Facility B); (3) the only way to ensure the safety of staff and

23   inmates and the security of the institution was to remove or isolate this target group; and (4) the

24   consequences for failing to act would have been dire.  (McDonald Decl. ¶ 60.)  Of note, as prison

25   officials removed alleged "Two-Five" members from the remainder of the Facility B population,

26   there was a marked decrease in violence.  (Id. ¶ 65.)

27        In considering plaintiff's motion for summary judgment, the court is required to believe

28   defendants' evidence and draw all reasonable inferences from the facts before the court in

48

1    defendants' favor.  Drawing all such reasonable inferences in defendants' favor, the court finds

2    that they have submitted evidence sufficient to create a genuine issue of material fact with respect

3    to plaintiff's claim that they violated his right to due process under the Fourteenth Amendment.

4    Specifically, a reasonable juror could conclude that prison officials subjected plaintiff to a

5    modified program for institutional safety and security reasons and therefore, they did not need to

6    provide him with any procedural due process protections, such as advance notice, a timely

7    hearing, and periodic review of his confinement.  See Hayward v. Procunier, 629 F.2d 599 (9th

8    Cir. 1980).  In addition, just as was the case of the plaintiff in Mitchell, plaintiff here has not

9    presented evidence or legal argument establishing that the procedural due process protections

10   afforded to individual prisoners placed in administrative segregation as a form of discipline, apply

11   to groups of prisoners moved to a separate unit and subjected to more restrictive modified

12   programming.[5]  See Mitchell, 2014 WL 4081763 at *7-8.

13          Accordingly, for all of the reasons set forth above, the undersigned concludes that

14   plaintiff's motion for summary judgment on his Fourteenth Amendment claims should be denied.

15          The court turns now to defendants' motion for summary judgment in their favor on

16   plaintiff's Fourteenth Amendment claims.  The court finds that defendants have met the initial

17   burden of demonstrating that there is no genuine issue of material fact with respect to the

18   plaintiff's Fourteenth Amendment claims.  Specifically, defendants' evidence demonstrates that

19   prison officials initially placed Facility B at HDSP on a modified program on September 18,

20   2009, in response to two coordinated, simultaneous stabbing incidents on September 17, 2009,

21   that occurred on opposite ends of the Facility B exercise yard.  (McDonald Decl. ¶¶ 2-3.)  Over

22   the course of correctional staff investigation it was discovered that the attacks were part of a

23   coordinated effort by the "Two Five" group to systemically murder or otherwise remove sex

24   _____

25   [5] The court observes that according to plaintiff's own evidence, prison officials informed him that
     he was not being placed in administrative segregation and was not due the same privileges and
26   procedures provided to inmates confined in administrative segregation.  (Pl.'s Ex. B (group
     administrative appeal and prison officials' responses thereto)).  Only after prison officials
27   completed their investigation into threats against other inmates and staff in May 2010 did they
     move the suspected "Two-Five" members from Facility B to administrative segregation.   (Defs.'
28   Ex. A44.)

                                                    49

1   offenders from Facility B.  (Id. ¶ 6.)  Correctional staff also discovered information indicating

2   that the "Two-Five" group planned to continue to attack inmates who were convicted sex

3   offenders every time prison officials returned Facility B to normal programming until they (the

4   "Two Five" members) were transferred to another institution.  (Defs.' Ex. A at A42.)  As noted

5   above, prison officials had identified plaintiff as a "Two-Five" group member or affiliate based

6   on a confidential memo, dated July 8, 2008, and housed him with other suspected "Two-Five"

7   members.  (Defs.' Ex. B-1–B-3, Defs.' Ex. A-5.)

8          Based upon the reports Warden McDonald received, he and his staff believed that the

9   "Two-Five" modified program at issue:  (1) was necessary to protect the lives of correctional staff

10  and inmates because of significant and credible threats of continued violence; (2) was a response

11  to severe and unusually high levels of violence on Facility B; (3) was designed solely to protect

12  the lives and safety of inmates and correctional staff members, who the warden believed were in

13  imminent danger of violent assaults; (4) did not last any longer than was necessary to protect the

14  lives and safety of inmates and correctional staff; (5) was not intended to prejudice or harass any

15  inmate; and (6) did not violate any statutory or constitutional rights.  (McDonald Decl. ¶ 66;

16  Gower Decl. ¶ 17, Davey Decl. ¶ 8, Van Leer Decl. ¶ 18.)  In this regard, according to the

17  evidence submitted by defendants on summary judgment, prison officials did not use the

18  modified programming as a form of individual punishment of plaintiff based on his conduct.

19         The Ninth Circuit Court of Appeals has made clear that the prisoners are not entitled to

20  procedural due process rights, such as notice and a hearing, prior to or during a lockdown if there

21  is a state of emergency at the prison.  See Hayward v. Procunier, 629 F.2d 599 (9th Cir. 1980).  In

22  Hayward, prisoners of the East Block of San Quentin State Prison filed a civil rights action

23  claiming they were entitled procedural due process in connection with a five-month prison

24  lockdown.  Id.  They urged that a lockdown lasting more than a short time without notice and a

25  hearing of some sort deprived them of a protected liberty interest.  Id. at 601.  The Ninth Circuit

26  rejected that argument, holding that the prisoners had no due process right to a hearing during

27  their five-month lockdown in light of the state of emergency that had existed at the prison.

28  Hayward, 629 F.2d at 603.  The Ninth Circuit noted that between 1970 and 1974, the rate of

50

1   violence at San Quentin State Prison had more than tripled, and that prison officials responded by

2   locking down the prison several times.  Id. at 600.  The Ninth Circuit explained that the prisoners

3   were not "being subjected to treatment wholly outside the foreseeable consequences of criminal

4   conviction, such as commitment to a mental institution in the absence of a mental disease or

5   defect."  Id. at 601-02.  The court emphasized that in cases where prisoners are entitled to a due

6   process hearing, the subject of the hearing was the fate of an individual prisoner and his conduct

7   or conditions.  Id. at 602 (citing Wolff v. McDonnell, 418 U.S. 539 (1974)).  In contrast, in

8   Hayward the court observed that, "the question to be decided is whether the degree of emergency

9   justifies a continuation of the lockdown – a determination involving a high degree of policy and

10   prediction."  Id.

11         Although the Ninth Circuit decided Hayward before the Supreme Court decided Sandin v.

12   Connor, which altered the methodology for evaluating procedural due process claims brought by

13   prisoners, Hayward is still good law.  As the another California district court recently explained in

14   a decision rejecting a prisoner's due process claim challenging his modified programming:

15        First, Hayward has not been overruled, and it has been applied post
16        Sandin in cases raising due process claims.

     Second, Hayward's conclusion that the increased security
17        represented by a lockdown is a "foreseeable consequence of a
     criminal conviction" indicates that a modified program in response
18        to assaults by inmates on staff and other inmates, even one lasting
     for a few months, is not an atypical and significant hardship relative
19        to the ordinary incidents of prison life.

20        Third, Sandin receded from the due process methodology of Hewitt
     v. Helms, 459 U.S. 460 (1983) in part because "the Hewitt
21        approach" had "led to the involvement of federal courts in the day-
     to-day management of prisons," which ran "counter to the view
22        expressed in several of our cases that federal courts ought to afford
     appropriate deference and flexibility to state officials trying to
23        manage a volatile environment."  To counteract this "undesirable
     effect," the Sandin Court "return[ed] to the due process principles"
24        reflected in Wolff and Meachum v. Fano, 427 U.S. 215 (1976).

25        Consistent with the due process principles later articulated in
     Sandin, the Ninth Circuit relied on Wolff and Meachum to support
26        its due process analysis in Hayward, and it also took into account
     the need to afford deference to prison officials in making decisions
27        respecting the continuance of lockdown and the pace of return to
     normal operations.
28        Finally, Sandin did not invalidate the distinction that the Ninth

1
2
3

> Circuit drew in <u>Hayward</u> between a lockdown imposed on a group
> of inmates in response to inmate assaults and an individualized
> disciplinary determination affecting a particular inmate's conditions
> of confinement.

4    <u>Hernandez v. Cate</u>, 918 F. Supp. 2d 987, 1013-1014 (C.D. Cal. 2013) (internal citations omitted).

5        Of course, in considering defendants' motion for summary judgment with respect to

6    plaintiff's due process claim, the court is required to believe plaintiff's evidence and draw all

7    reasonable inferences from the facts before the court in his favor.  Drawing all reasonable

8    inferences from that evidence in plaintiff's favor, the court finds that plaintiff has failed to submit

9    sufficient evidence to create a genuine issue of material fact with respect to his claim that he had

10   a protected liberty interest in avoiding his challenged confinement.  Specifically, plaintiff has

11   failed to establish that he was subjected to anything more than modified, albeit harsher,

12   programming.  That prison officials suspected plaintiff in this case of being a member of the

13   "Two-Five" group and kept him and other suspected group members on a more restrictive

14   modified program than other inmates, does not change the applicability of the <u>Hayward</u> decision

15   and the analysis set forth therein to plaintiff's due process claim.

16       Following the decision in <u>Hayward</u>, district courts in the Ninth Circuit have consistently

17   held that subjecting specific groups of prisoners to lockdowns or harsher modified programs does

18   not require prison officials to provide those specific groups of prisoners with procedural due

19   process protections.  Thus, in <u>Corona v. Harrington</u>, No. CV F 08-0237 LJO DLB, 2010 WL

20   318555 (E.D. Cal. Jan. 20, 2010), the plaintiffs were general population cellmates in Building 5 at

21   Kern Valley State Prison with the highest privilege group classification.  <u>Id.</u> at *1.  After a staff

22   attack in May 2006, which plaintiffs were not involved in, prison officials placed Buildings 1-8

23   on a lockdown and interviewed all inmates regardless of ethnicity or gang affiliation.  <u>Id.</u>  Prison

24   officials placed the inmates actually involved in the attack in administrative segregation.  <u>Id.</u>  In

25   June 2006, prison officials concluded that the attack involved only Southern Hispanics or

26   Mexican Nationals and kept the Hispanic inmates on lockdown but allowed Black, White, and

27   "Other" inmates to return to normal programming with restoration of all privileges.  <u>Id.</u> at *2.

28   Prison officials also allowed Hispanic inmates assigned to the substance abuse program in

1   Building 5 and age 35 and older (not plaintiffs) to return to normal privileges.  Id.  By September

2   2006, prison officials had allowed all inmates except Southern Hispanic inmates to return to

3   normal programming because additional incidents involving Southern Hispanics had taken place.

4   Id.  At that point, prison officials also moved plaintiffs from Building 5 to Building 9.  Id.  In

5   October 2006, the warden approved dayroom access, telephone calls, and a normal shower

6   program for Southern Hispanics in Buildings 1-4 but kept Southern Hispanics in Buildings 6-8,

7   including plaintiffs, on more restrictive programs.  Id.  Effective November 2006, prison officials

8   lifted the lockdown and allowed all Southern Hispanics to return to normal program.  Id. at *3.

9   The plaintiffs filed a civil rights action in which they claimed that they had been deprived of a

10  protected liberty interests without due process of law because they did not receive a hearing or

11  other individualized determination prior to or during defendants' subjecting them to the modified

12  programming.  Id. at *3.

13          Relying on the Ninth Circuit's decision in Hayward, the court held that the key to

14  plaintiffs due process claim was whether the degree of emergency justified continuation of the

15  lockdown.  See Corona, 2010 WL 318555 at *9.  In rejecting plaintiffs' due process claim, the

16  court explained:

17              The procedural due process claim rests on the conclusory claim that
                no emergency existed to justify a five-month lockdown.  Plaintiffs
18              do not appear to contest the initial lockdown based on the staff
                attack.  They appear to contest the continuation of lockdown of
19              Hispanic inmates under age 35.  As noted above, the continued
                lockdown applied to a limited prison population and not to
20              Hispanics as a whole.  Plaintiffs themselves refer to the lockdown
                inmates as a "sub-group."  Decisions to maintain the lockdown for
21              the sub-group "is not a disciplinary measure, but an administrative
                strategy designed to preserve order in the prison and protect the
22              safety of all inmates" as well as staff.  The maintenance of the
                lockdown for the "sub-group" is akin to assigning suspected gang
23              affiliates to particular prison housing units which "is essentially a
                matter of administrative discretion."  In the absence of challenge to
24              their Southern Hispanic affiliation, the FAC fails to establish a
                procedural due process violation for the continued lockdown of
25              Hispanic inmates under age 35.

26  Corona, 2010 WL 318555 at *9.  See also Mitchell, 2014 WL 4081763 at *8 ("This analysis does

27  not turn on the fact that the lockdown at issue in Hayward was institution-wide.  It applies equally

28  to the collective lock-down of inmates in a particular unit of a prison.").

In Negrete v. Lewis, No. C 11-3436 RS (PR), 2012 WL 4903001 (N.D. Cal. Oct. 16, 2012), aff'd 585 Fed. Appx. 364 (9th Cir. Oct. 7, 2014), another California district court has rejected a similar due process claim brought by a prisoner in connection with lockdowns and modified programming with respect to two rival prison gangs. In that case two violent incidents had occurred at Pelican Bay State Prison between inmates of the Northern Hispanic and Southern Hispanic gangs. Id. at *1. Prison officials implemented lockdowns and modified programs designed to separate the two gangs. Id. Further violence between the two gangs thwarted efforts to terminate the restrictive programming. Id. Plaintiff transferred into the prison, and prison officials classified him as a Southern Hispanic inmate and immediately subjected him to the modified program. Id. The plaintiff claimed that defendants violated his right to due process by placing him on constant lockdown or modified programming for almost two years. Id. The court held that the plaintiff had not shown a triable issue of material fact with respect to his due process claim. Id. at *3. In so holding, the court explained as follows:

> Although plaintiff did not directly participate in the incidents, his conduct is not at issue. What is at issue is whether the degree of emergency justified a continuation of the lockdown. The undisputed facts in the record show that before plaintiff arrived at Pelican Bay and during plaintiff's stay, there were a number of incidents between the Northern Hispanic and Southern Hispanic inmates. Although plaintiff described them as "small incidents," he nonetheless characterized some of them as assaults or riots. Because prison officials must maintain the safety of inmates, it was reasonable to implement lockdowns to separate Northern and Southern Hispanic inmates after the assaults. Here, the captain of Facility B stated that lockdowns and modified programs were implemented initially in response to a violent incident that occurred in August 2008 at Facility B's main exercise yard. The fact that more violence occurred after the initial incident in 2008 tends to support the idea that the lockdowns were a necessary response in order to maintain prisoners' safety during that time …. Because the lockdowns were in response to a genuine emergency and were not used as punishment, plaintiff was not owed procedural due process in the form of a hearing or otherwise before being locked down.

Id. at *3.

Another California district court has rejected a similar claim by Muslim inmates who maintained that prison officials denied them their right to due process when they implemented modified programming without providing the inmates advance notice or an opportunity for a

1    hearing.  See Robins v. Lamarque, No. C 02-4720 JF (PR), 2008 WL 744816 at *4 (N.D. Cal.

2    Mar. 18, 2008).  In Robins, the plaintiff was housed in Facility D, a maximum-security housing

3    unit for prisoners requiring the highest security custody.  Id. at 1.  On October 5, 2001, prison

4    officials informed Muslim inmates that they were being placed on a modified program and

5    restricted to their cells because prison officials had learned of a plan by Muslim inmates to attack

6    prison staff.  Id.  In that case the district court granted summary judgment to the defendants,

7    concluding that plaintiff's due process claim failed as a matter of law and explaining as follows:

8            In light of the undisputed evidence concerning threats of violence
             by Muslim inmates, there is no genuine issue of material fact as to
9            whether the inmates had a liberty interest that triggered a right to
             notice.  Moreover, it is clear that Plaintiff knew that the modified
10           program had been initiated, as shown by the fact that he filed an
             administrative grievance on October 14, 2001, only nine days after
11           the modified program was put in place.  Prison officials responded
             to the grievance in November 2001 and interviewed Plaintiff after
12           he appealed to the Second Level of Review.  Prison staff also
             responded to Plaintiff's separate appeal as a member of a group of
13           inmates who filed a grievance in October 2001.

14   Id. at 5.

15           Similarly, in the present case the evidence presented by plaintiff in response to

16   defendants' summary judgment motion fails to create a triable issue of fact with respect to

17   whether defendants' decision to implement and continue the Facility B modified program from

18   September 18, 2009, to June 9, 2009, was warranted in light of the undisputed evidence of

19   violence and threats of violence by suspected "Two-Five" group members that both led up to and

20   took place during the modified programming.  See Hayward, 629 F.2d at 602 (the question is

21   whether the degree of emergency justified the continued lockdown); see also Furnace v. Evans,

22   No. C 06-4229 MMC (PR), 2009 WL 2511967 at *16 (N.D. Cal. Aug. 14, 2009) (granting

23   summary judgment in favor of defendants because plaintiff failed to raise a triable issue of fact

24   with respect to whether prison officials reasonably determined that prison conditions warranted

25   the implementation and continuation of a modified program), aff'd in relevant part 459 Fe. Appx.

26   630, at *1 (9th Cir. Nov. 23, 2011).

27           Moreover, plaintiff in this case has not established that groups of prisoners moved to a

28   separate unit and subject to a more restrictive modified programming, such as the alleged "Two-

1  Five" group members, are entitled to the same procedural due process protections as individual

2  prisoners who are placed in administrative segregation as a form of discipline.  See Hayward, 629

3  F.2d at 602 (concluding that a five-month lockdown while imprisoned was a foreseeable

4  consequence of a criminal conviction).[6]

5       Accordingly, for all of the reasons set forth above, the undersigned concludes that

6  defendants' motion for summary judgment with respect to plaintiff's Fourteenth Amendment

7  claims should be granted.

8  II. Eighth Amendment

9       The court will now address the parties' cross-motions for summary judgment with respect

10  to plaintiff's Eighth Amendment claims against defendants for denying him outdoor exercise,

11  placing him in a cold cell, and refusing to provide him with personal hygiene items.

12       A.  Outdoor Exercise

13       Prisoners have a constitutional right to outdoor exercise under the Eighth Amendment.

14  See Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010) ("Exercise is one of the most basic human

15  necessities protected by the Eighth Amendment."); LeMaire v. Maass, 12 F.3d 1444, 1457 (9th

16  Cir. 1993).  Long-term denial of outdoor exercise can rise to the level of a constitutional

17  violation.  See Spain v. Procunier, 600 F.2d 189 (9th Cir. 1979).  However, it is also true that

18  "prison officials are authorized and indeed required to take appropriate measures to maintain

19  prison order and discipline and protect staff and other prisoners. . . ."  LeMaire, 12 F.3d 1458.

20       In this case, even if plaintiff had carried his initial burden in support of his motion for

21  summary judgment or had raised a genuine dispute of material fact as to whether defendants

---

[6]  Insofar as plaintiff claims that he had a protected liberty interest in avoiding the stigma attached
to him as a result of being included in the "Two-Five" modified program, his claim fails.  Plaintiff
is advised that "stigma alone is inadequate to affect a liberty interest" protected by the due
process clause.  ACLU of Nev. v. Masto, 670 F.3d 1046, 1058 (9th Cir. 2012) (citing Paul v.
Davis, 424 U.S. 693, 711-12 (1976) (reputation alone without more tangible interests is not a
"liberty" that triggers the procedural protections of the Due Process Clause).  See also Cooper v.
Dupnik, 924 F.2d 1520, 1532 (9th Cir. 1991) (discussing the two ways to meet the stigma-plus
test).  Here, plaintiff alleges his inclusion in the modified program as an alleged "Two-Five"
member or affiliate stigmatizes him because plaintiff is shunned, open to attack, and false
accusations.  However, plaintiff has not alleged that he suffered any other injury other to his
reputation.

1    violated his right to outdoor exercise in opposing defendants' motion for summary judgment, the

2    undersigned concludes that defendants are entitled to qualified immunity from plaintiff's claims

3    based on the alleged denial of outdoor exercise.  Specifically, the undersigned finds that a

4    reasonable prison official in the position of these defendants could have believed that restricting

5    plaintiff's outdoor exercise as part of the modified programming imposed was consistent with the

6    Eighth Amendment because there was no clearly established law to the contrary.

7        In Norwood v. Vance, 591 F.3d 1062 (9th Cir. 2010), a state prisoner at CSP-Sacramento

8    claimed that prison officials denied him outdoor exercise over the course of two years during four

9    separate extended lockdown periods of three, three, four and half, and two months in duration.

10   Norwood, 591 F.3d at 1065.  Prison officials had imposed the lockdowns after serious inmate

11   assaults on staff and gradually eased restrictions on specific gangs and ethnic and racial groups

12   and restored outdoor exercise to inmates who they considered less likely to cause further

13   violence.  Id.  Inmate-on-inmate attacks also took place during the same period of time.  Id.

14       Under those circumstances the Ninth Circuit held that the prison officials named as

15   defendants in that case were entitled to qualified immunity because the right to outdoor exercise

16   in the midst of severe ongoing prison violence was not clearly established in 2002-2003.

17   Norwood, 591 F.3d at 1068.  First, the court explained that the defendants were attempting to

18   restore order after several nearly lethal attacks on prison staff, and therefore, they had substantial

19   reasons for imposing the lockdowns at issue.  Id.  The court also explained that the right of

20   prisoners to outdoor exercise is not absolute or indefeasible in the face of prison violence, and

21   that the plaintiff had not offered any evidence to show that prison officials had imposed the

22   lockdowns punitively or in bad faith.  Id. at 1068-69.  The court concluded that "prison officials

23   can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the

24   violence under control."  Id.  In this regard, the court observed that prison officials must balance

25   their duty to keep inmates safe from each other with their obligation to provide outdoor exercise.

26   Id.  The court noted that one prisoner had died and other correctional guards and prisoners had

27   been severely wounded, so defendants were required to act decisively to stop the violence.  Id.

28   The Ninth Circuit also explained that courts grant prison officials "wide-ranging deference" when

they balance their competing obligations and do not "lightly" second guess expert judgments

about when to restore outdoor exercise and other programs in the face of the threats of violence.

Id.  Based on these considerations the court in Norwood concluded that a reasonable prison

official could have believed that restricting a prisoner's outdoor exercise was consistent with the

dictates of the Eighth Amendment because no authority had clearly established the contrary.  Id.

at 1070.

Similarly, in Noble v. Adams, 646 F.3d 1138 (9th Cir. 2011), the court held that prison

officials were entitled to qualified immunity on a state prisoner's claim based on the denial of

outdoor exercise during a lockdown following a prison riot.  In Noble, an armed riot between

African American inmates and correctional staff took place at Substance Abuse Treatment Center

– Corcoran State Prison, and the warden declared a state of emergency (approved by the Director

of Corrections), locking down the entire prison.  Id. at 1139-40.  Twenty-one staff members were

injured, and nine were taken to the hospital following the riot.  Id. at 1140.  Prison officials found

numerous inmate-manufactured weapons on the exercise yards.  Id.  This riot took place one day

after prison officials had lifted a previous prison-wide lockdown.  Id.  Three months later, prison

officials gradually returned prisoners to normal programming in measured stages.  Id.  Within

seven months of the riot, all inmates had access to a modified program for outdoor exercise, but

another riot took place thereby thwarting efforts to restore full exercise privileges until several

months thereafter.  Id. at 1141.  Plaintiff Noble claimed that prison officials had violated his right

to outdoor exercise under the Eighth Amendment.  Id. at 1141.

In this context, the Ninth Circuit held that

> it was not clearly established in 2002 – nor is it established yet [in
> 2011] – precisely how, according to the Constitution, or when a
> prison facility housing problem inmates must return to normal
> operations, including outside exercising, during and after a state of
> emergency called in response to a major riot, here one in which
> inmates attempted to murder staff.

Noble, 646 F.3d at 1143.  The Ninth Circuit reiterated in Noble that prison officials are entitled to

"wide-ranging deference" and that courts must defer to prison officials' judgment as long as it

does not manifest deliberate indifference or an intent to inflict harm.  Id.  The court also noted

1  that after the attack on the exercise yard against correctional staff, prison officials were justified

2  in declaring an emergency and imposing a lockdown, which by definition precluded typical

3  outdoor exercise, until prison officials could gradually restore it. Id. at 1144.  The court observed

4  that responsible officials were constantly reviewing the lockdown to determine how and when to

5  safely lift it. Id. at 1147.  In this regard, the Ninth Circuit found that prison officials were not

6  deliberately indifferent, and the lockdown was not in excess of what was necessary to restore

7  order. Id. at 1148.  The court concluded that, "in 2002, it would not have been clear to a

8  reasonable officer that his or her conduct vis a vis the declaration of an emergency, the lockdown,

9  or the curtailment of use of the exercise yard was unlawful in the situation he or she confronted."

10  Id.

11        In the present case, plaintiff complains about not receiving outdoor exercise for almost

12  eight months - from October 6, 2009, until May 31, 2010.  (Am. Compl. at 29.)  Under the Ninth

13  Circuit's decisions in Norwood and Noble, however, it was not clearly established in 2009 - 2010

14  how and under what circumstances prison officials were constitutionally required to provide

15  plaintiff with outdoor exercise in light of the ongoing violence at HDSP.  See, e.g., Negrete v.

16  Lewis, 585 Fed. Appx. 364 (9th Cir. Oct. 7, 2014); Arline v. Gower, No. 2:11-cv-3414 WBS KJN

17  P, 2014 WL 3687497 (E.D. Cal. July 23, 2014) (prison officials were entitled to qualified

18  immunity from a prisoner's denial of outdoor exercise claim because of the absence of

19  established law in 2011 clarifying when and under what circumstances a security-based lockdown

20  becomes unconstitutional); Crane v. McDonald, No. 2:11-cv-0663 KJM CKD P, 2014 WL

21  2716484 at *15 (E.D. Cal. June 16, 2014) (prison official was entitled to qualified immunity from

22  a prisoner's denial of outdoor exercise claim based on the absence of established law in 2008-

23  2010 clarifying when a security-based lockdown becomes unconstitutional); Knight v. Evans, No.

24  C 06-00887 SBA (PR), 2009 WL 1916879 at *10 (N.D. Cal. July 1, 2009) (granting qualified

25  immunity to defendants because "it would not be clear to a reasonable prison official that it was

26  unlawful to temporarily curtail Plaintiff's outdoor exercise for 144 days" given the violent

27  conditions at the prison, including attempted murder and assault on inmates and assaults on staff,

28  and discovery of contraband narcotics and weapons).

1   Decisions by prison officials involving when to ease prison programming restrictions "are

2   delicate ones, and those charged with them must be given reasonable leeway." Hayward, 629

3   F.2d at 603. As in Noble, the evidence submitted on summary judgment in this case demonstrates

4   that prison officials were "continuously, prudently, and successfully looking out for the safety,

5   security, and welfare of *all* involved, staff and prisoners alike." Noble, 646 F.3d at 1148. In the

6   absence of clearly established law at the time the alleged constitutional violations took place in

7   this case, the undersigned finds that defendants are entitled to qualified immunity with respect to

8   plaintiff's Eighth Amendment outdoor exercise claim.

9   Accordingly, plaintiff's motion for summary judgment in his favor on his Eighth

10   Amendment outdoor exercise claim should be denied, and defendants' motion for summary

11   judgment on the basis of qualified immunity with respect to this claim should be granted.

12   B. Cold Cell

13   Freezing temperatures in a cell that pose a substantial risk of serious harm can rise to the

14   level of an Eighth Amendment violation. See Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir.

15   1980). When a prisoner challenges his cell conditions as cruel and unusual punishment, he is

16   required to allege and prove deliberate indifference on the part of prison officials. See Wilson v.

17   Seiter, 501 U.S. 294 (1991). First, a plaintiff must make an "objective" showing that his alleged

18   deprivation was "sufficiently serious" to form the basis for an Eighth Amendment violation. Id.

19   at 298. See also Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) ("the routine discomfort

20   inherent in the prison setting is inadequate to satisfy the objective prong of the Eighth

21   Amendment inquiry"). Second, the plaintiff must make a "subjective" showing that prison

22   officials acted "with a sufficiently culpable state of mind." Wilson, 501 U.S. at 298. See also

23   Farmer, 511 U.S. at 837 (a prison official acts with deliberate indifference if he "knows of and

24   disregards an excessive risk to inmate health or safety; the official must both be aware of facts

25   from which the inference could be drawn that a substantial risk of serious harm exists, and he

26   must also draw the inference.").

27   As to plaintiff's motion for summary judgment on his Eighth Amendment claim

28   concerning defendants allegedly placing him in a cold cell, the court finds that plaintiff has failed

60

1  to establish beyond dispute that the defendants inflicted cruel and unusual punishment on him.

2  Specifically, plaintiff contends that from October 6, 2009 to November 20, 2009, defendants

3  placed him in a cold cell allowing him to be clothed in only his underwear for twenty-four hours a

4  day.[7]  (Pl.'s Opp'n to Defs.' Mot. for Summ. J./Cross-Mot. for Summ. J. at 26-32.)  In this regard,

5  plaintiff maintains that defendants denied him a basic human need (warmth) in violation of the

6  Eighth Amendment.  (Id. at 26.)

7          However, the evidence presented by plaintiff on summary judgment fails to establish that

8  defendants deprived him of adequate heating.  Plaintiff primarily relies on his personal

9  declaration to satisfy the objective prong of an Eighth Amendment claim.  A declaration by its

10  nature is self-serving because the party submitting it is using it to support his position.  See Nigro

11  v. Sears, Roebuck & Co., 784 F.3d 495, 498 (9th Cir. 2015).  Of course, the court may not

12  disregard such a declaration simply based on its self-serving nature.  Id.  However, the court can

13  disregard such a declaration if the purported facts contained therein are beyond the declarant's

14  personal knowledge or the declaration is lacking detailed facts and supporting evidence.  Id.

15  (citing Villiarimo v. Aloha Island Air, 281 F.3d 1054, 1059 n. 5, 1061 (9th Cir. 2002) (holding

16  that the district court properly disregarded the declaration that included facts beyond the

17  declarant's personal knowledge and did not indicate how she knew the facts to be true) and F.T.C.

18  v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) (conclusory affidavit, lacking

19  detailed facts and supporting evidence, does not create a genuine issue of material fact));

20  Soremekun, 509 F.3d at 984 ("Conclusory, speculative testimony in affidavits and moving papers

21  is insufficient to raise genuine issues of fact and defendant summary judgment."); see also Fed. R.

22  Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on

23  personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

24  or declarant is competent to testify on the matters stated.").

25  _____

26  [7]  Plaintiff also alleges that he was given only a thin sheet.  (Am. Compl. at 6 ("being placed in a cold cell with only a thin sheet"), 12 ("From 10-7-09 till 11-20-09, plaintiff only had one thin

27  sheet…."), & 29 ("placed in a cold cell without any linen except a thin sheet.").  He clarifies in his declaration in support of his summary judgment motion that a fellow inmate had provided him

28  with the sheet.  (Pl.'s Decl. ¶ 22d.)

1    Here, plaintiff declares that the inside and outside walls of his cell had "absolutely no

2    insulation," that the concrete walls kept the building "consistently cold," and that temperatures

3    outside of HDSP during the relevant time period averaged a maximum of fifty-seven (57) degrees

4    and a minimum of thirty-one (31) degrees.  (Pl.'s Decl. ¶¶ 21j & 28, Pl.'s Opp'n to Defs.' Mot.

5    for Summ. J./Cross-Mot. for Summ. J. at 30.)  However, it is not clear how plaintiff has personal

6    knowledge of either the building structure or its insulation.  Nor is plaintiff's personal

7    characterization of the cell temperature sufficient to demonstrate that no reasonable trier of fact

8    could find other than for him on his Eighth Amendment claim.  Finally, even if the average

9    temperature outside of the prison ranged from 31 degrees to 57 degrees, the outside temperature

10   at HDSP has no clear bearing on the actual temperature inside of plaintiff's cell at any given time.

11   Certainly plaintiff has failed to come forward with any evidence explaining a relationship

12   between the inside and outside temperatures.

13   On the other hand, defendants have offered evidence on summary judgment

14   demonstrating that during the wintertime, from November 1 through April of the following year,

15   all buildings at HDSP, including Facility B were maintained at sixty-eight (68) degrees in keeping

16   with the directive issued by the Governor of the State of California.  (Wilkerson Decl. ¶ 3.)

17   Additionally, according to defendants' evidence, during the summertime, which concludes on

18   October 31, HDSP facilities are required to maintain daily temperature logs of the buildings.

19   These logs record the daily temperature in each building in Facility B and the relevant logs show

20   that Facility B, Building 2 was maintained at temperatures between seventy-one (71) and seventy-

21   three (73) degrees from October 6, 2009, through October 31, 2009.  (Id. ¶ 8-9; Defs.' Ex. R.)

22   Defendants evidence on summary judgment also demonstrates that when a cell, or any

23   section of the building at HDSP has an issue with the temperature, such as the cell or section

24   getting too cold or too hot, the Engineer assigned to Facility B would receive a call for service,

25   would go to the facility to diagnose the source of the temperature variation, and correct the

26   problem, which could include replacement of parts.  (Wilkerson Decl. ¶ 4.)  Defendants have

27   come forward with evidence on summary judgment establishing that from October 6, 2009,

28   through May 26, 2010, there was only one call for service from Facility B, Building 2, for cell

1   150 on November 19, 2009 and that the heating problem was investigated and corrected by

2   November 24, 2009.  (Id. ¶ 5-7; Defs.' Ex. Q.)  That same evidence establishes that there were no

3   other calls for service during that time frame, thus indicating that Facility B had no temperature-

4   related problems.  (Wilkerson Decl. ¶ 10.)  From October 6, 2009, through May 26, 2010,

5   plaintiff was housed in cell 246 and subsequently in cell 205, in Facility B, Building 2.  (Amrein

6   Decl. ¶ 2-4; Defs.' Ex. O.)

7          As noted above, on plaintiff's motion for summary judgment, the court is required to

8   believe defendants' evidence and draw all reasonable inferences from the facts before the court in

9   defendants' favor.  Drawing all reasonable inferences in defendants' favor, the court finds that

10  defendants have submitted evidence sufficient to create a genuine issue of material fact with

11  respect to plaintiff's claim that they violated his right to be free from cruel and unusual

12  punishment under the Eighth Amendment.  Specifically, a reasonable juror could conclude from

13  the evidence presented on summary judgment that plaintiff's cell temperature from October 6,

14  2009, to November 20, 2009, ranged from sixty-eight (68) to seventy-three (73) degrees, and

15  therefore defendants did not deny him warmth as a basic human need.  See Graves v. Arpaio, 623

16  F.3d 1043, 1049 (9th Cir. 2010) (Eighth Amendment does not mandate a "comfortable"

17  temperature).

18         Accordingly, the undersigned concludes that plaintiff's motion for summary judgment in

19  his favor on his Eighth Amendment claim based on the alleged temperature in his cell should be

20  denied.

21         The court now turns to defendants' motion for summary judgment on this same claim.

22  Based on defendants' evidence described above, the court finds that defendants have met their

23  initial burden of demonstrating that there is no genuine issue of material fact with respect to the

24  plaintiff's Eighth Amendment claim based on the temperature of his cell.  Specifically,

25  defendants' evidence demonstrates that they provided plaintiff with adequate heating in his cell

26  from October 6, 2009 to November 20, 2009, in accordance with the requirements of the Eighth

27  Amendment.  See Graves, 623 F.3d at 1049.

28  /////

Of course, on defendants' motion for summary judgment the court is required to believe plaintiff's evidence and draw all reasonable inferences from the facts before the court in plaintiff's favor.  Drawing all reasonable inferences in plaintiff's favor, the court finds that plaintiff has failed to submit evidence on summary judgment sufficient to create a genuine issue of material fact with respect to his claim that defendants placed him in a cold cell in violation of the Eighth Amendment.

In opposing defendants' motion for summary judgment on this claim, plaintiff merely refers this court to his motion for summary judgment and evidence submitted in support thereof. Again, however, although plaintiff has submitted declarations attesting to how consistently cold it was in his cell, he has not submitted evidence in the form of objective temperature readings from inside the building to indicate the actual temperature in his cell during the time frame in question. Several courts in the Ninth Circuit, including this one, have rejected similarly unsupported claims.

For instance, in Jacobs v. Quinones, No. 1:10-cv-02349 AWI JLT (PC), 2015 WL 4755956 (E.D. Cal. Aug. 11, 2015), the plaintiff claimed that the defendant subjected him to an in-cell temperature that was "cold and freezing being that Plaintiff was denied clothing and linen to wrap or warm himself with" for more than thirty days.  Id. at *4.  In moving for summary judgment in that case the defendants presented evidence showing that during the relevant time the temperature in plaintiff's cell was maintained in the mid-70s and therefore, they did not subject him to a substantial risk of serious harm to his health.   Id. at *5.  In light of that evidence the court granted defendant's motion for summary judgment on plaintiff's Eighth Amendment claim, explaining:

> As to the temperature within his cell, Plaintiff only alleges that it
> was "freezing" and "cold."  The First Amended Complaint[8] does
> not specifically quantify in degrees the temperature in Plaintiff's
> cell of which he complained, nor does it explain upon what he was
> basing his terms of "freezing" and "cold" aside from his impression
> of the temperature he perceived via his skin.  Plaintiff may have

---

[8]  In Jacobs, the plaintiff failed to file an opposition to defendant's motion for summary judgment and therefore the court looked to the allegations of plaintiff's amended complaint, which may be utilized in attempting to establish the existence of a factual dispute.  See Jacobs, 2015 WL 4755956 at *6.

1  
2  
3  
4  
5  
6  
7

> perceived his cell as being freezing cold, but his perception does not qualify as evidence of an objective element that was likely to cause him harm. Further, while Plaintiff alleges a number of symptoms that he attributes to the conditions of his confinement, including the temperature of his cell, his allegations fail to show that he is qualified to opine that the temperature of his cell in the timeframe in question caused any medical sequela. Fed. R. Evid. 701, 702. Given the sparsity of amenities provided while on property restriction, it is understandable that Plaintiff may have perceived the temperature to have been lower than it actually was, but this is not admissible evidence to show that the temperature was anywhere near "freezing" (32°).

8   Id. at *6. See also Garland v. Stanley, No. 1:12-cv-01755 AWI MJS (PC), 2015 WL 1513635 at

9   *7 (E.D. Cal. Mar. 30, 2015) (granting summary judgment in favor of defendants because

10   "[a]lthough plaintiff claims that temperatures inside the facility were 'very cold' and 'freezing,'

11   he provides no objective indication, or even estimate, of the actual temperature in or outside of

12   the institution on that date . . . . The absence of more specific information about the temperature

13   or its effects on Plaintiff prevents this court from finding that a deprivation of blankets and

14   adequate clothing overnight amounts to an Eighth Amendment violation."); Viera v. Lewis, No. C

15   12-1497 RS (PR), 2014 WL 3853142 at *4 (N.D. Cal. Aug. 4, 2014) (plaintiff presented no

16   evidence precluding summary judgment because his "generalized contention that his cell is

17   'oppressively hot or cold' is far too vague and undetailed to raise a genuine dispute of material

18   fact. Moreover, defendants have provided evidence with such specifics.").

19      Even if plaintiff here could satisfy the objective prong with respect to this Eighth

20   Amendment claim either in support of his own motion for summary judgment or by raising a

21   genuine issue of material fact in opposition to defendants' motion for summary judgment, he has

22   not presented any evidence showing that defendants had a subjective intent or desire to keep

23   plaintiff in a cold cell. It is well established that cruel and unusual punishment claims require the

24   court to inquire into a prison official's state of mind. See Wilson, 501 U.S. at 299. Here, the

25   court finds no evidence presented in connection with the pending summary judgment motions that

26   supports plaintiff's claim that defendants intentionally denied him adequate warmth in reckless

27   disregard to a substantial risk of serious harm to plaintiff. Farmer, 511 U.S. at 835. Plaintiff's

28   conclusory contentions about the "obviousness of the risk" to him because defendants saw him in

1   his underwear and sandals prior to moving him to Facility B, Building 2 are not enough to

2   establish that defendants acted with the requisite culpable state of mind.  See Nelson v. Pima

3   Cmty. Coll., 83 F.3d 1075, 1081 (9th Cir. 1996) ("The mere existence of a scintilla of evidence is

4   not enough to create a genuine issue of material fact in order to preclude summary judgment.")

5   (internal quotation marks omitted).

6        Accordingly, the undersigned concludes that defendants' motion for summary judgment in

7   their favor on plaintiff's Eighth Amendment claim based on the alleged temperature in his cell

8   should also be granted.

9        C.  Personal Hygiene Items

10       Prisoners have a constitutional right to access personal hygiene items under the Eighth

11   Amendment.  See Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996); Toussaint v. McCarthy,

12   801 F.2d 1080, 1107 (9th Cir. 1986) (prison officials must provide inmates with basic human

13   needs, including sanitation.).  However, only those deprivations denying "the minimal civilized

14   measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment

15   violation."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

16       In this case, the parties dispute whether defendants forced plaintiff to go without personal

17   hygiene items, including soap, toothbrush, toothpaste, and toilet paper for a four day period.[9]

18   However, plaintiff's claim that defendants temporarily deprived him of hygiene supplies as a

19   matter of law does not rise to the level of an Eighth Amendment violation.  See, e.g., Murillo v.

20   Bueno, No. 1:12-cv-00095 LJO DLB PC, 2013 WL 1731393 at *1-*2 (E.D. Cal. Apr. 22, 2013)

21   (prisoner not provided with toothbrush, toothpaste, soap, toilet paper, or deodorant for

22   approximately five days while housed in holding cell failed to state a cognizable Eighth

23   Amendment claim); Lopez v. Cate, No. 1:10-cv-01773 AWI SKO PC, 2013 WL 239097 at *8

24   (E.D. Cal. Jan. 22, 2013) ("the deprivation of a towel and soap for approximately four days, and

25   the deprivation of toilet paper, a toothbrush, and tooth powder for approximately seven days do

26

27   [9]  Plaintiff acknowledges in his complaint that he received a small amount of toilet paper as well
     as a grievance form from other inmates in Building 2 on his second day of what he characterizes
28   as "segregation."  (Am. Compl. at 11.)

66

1   not rise to the level of an Eighth Amendment violation."); <u>Stansbury v. U.S. Gov't</u>, No. 1:09-cv-

2   01043 DLB PC, 2010 WL 2079727 at *2 (E.D. Cal. May 21, 2010) ("Deprivation of personal

3   hygiene items, laundry service, and dinner over four days does not rise to the level of a

4   deprivation that satisfies the objective prong of deliberate indifference in violation of the Eighth

5   Amendment."); <u>see also</u> <u>Williams v. Delo</u>, 49 F.3d 442, 444-45 (8th Cir. 1995) (denial of

6   toothbrush, toothpaste, soap, and deodorant for four days was not a deprivation of the minimal

7   civilized nature of life's necessities); <u>Harris v. Fleming</u>, 839 F.2d 1232, 1234-36 (7th Cir. 1988)

8   (no constitutional violation where an inmate was deprived of soap, toothbrush, and toothpaste for

9   ten days).

10       Accordingly, the undersigned concludes that plaintiff's Eighth Amendment claim based

11   on the alleged denial of access to personal hygiene items for a period of four days should be

12   dismissed for failure to state a cognizable claim for relief.

13                                        **OTHER MATTERS**

14       Also pending before the court are plaintiff's requests to exclude certain evidence.  First,

15   plaintiff has filed a motion to exclude Warden McDonald's declaration because defendants

16   purportedly never disclosed Warden McDonald as a key witness in this case after multiple

17   discovery requests from plaintiff had asked them to do so.  Plaintiff cites Rule 37(c)(1) of the

18   Federal Rules of Civil Procedure in support of his request to exclude the declaration of Warden

19   McDonald.  (Doc. No. 78)

20       Plaintiff's request is without merit.  Under Rule 37(c)(1) of the Federal Rules of Civil

21   Procedure, a party that fails to disclose information required by Rule 26(a) or 26(e) without

22   substantial justification is not allowed to use the evidence on a motion, at a hearing, or at trial.

23   <u>See</u> Fed. R. Civ. P. 37.  As an initial matter, the parties are exempt from initial disclosure

24   requirements in this case.  <u>See</u> Fed. R. Civ. P. 26(a)(1)(B)(iv).  Moreover, to the extent plaintiff

25   believed that defendants had not adequately responded to his discovery requests inquiring about

26   potential defense witnesses, his recourse was to file a motion to compel a response with this court

27   before the close of discovery.  To be sure, plaintiff filed a motion to compel in this case, but as

28   this court stated in its order denying the motion, plaintiff had not adequately informed the court

1    which of his discovery requests were the subject of his motion to compel and why he believed

2    that defendants' responses were deficient.  (Doc. No. 71)  This court will not now exclude

3    evidence submitted by defendants on summary judgment simply because plaintiff failed to

4    discover it prior to its presentation.  Finally, as defense counsel observes, Warden McDonald's

5    name appears on virtually every official document concerning the modified programming at issue

6    in this case.  Plaintiff submitted many of these documents to the court in support of his own

7    motion for summary judgment.  Accordingly, it appears that plaintiff was well aware of Warden

8    McDonald's involvement with the modified programming order which he seeks to challenge here.

9         In the same motion, plaintiff also seeks to exclude defendants' Exhibit B, which is a

10   confidential memorandum dated July 8, 2008, in which another inmate identified Gomez as a

11   member of the "Two-Five" group.  (Doc. No. 78)  Plaintiff contends that the defendants did not

12   identify or produce such information after multiple discovery requests from plaintiff had asked

13   them to do so.  (Id.)

14        This request is also without merit.  Again, insofar as plaintiff believed that defendants had

15   not adequately responded to his discovery request, his recourse was to file a properly supported

16   motion to compel with the court.  Moreover, when defendants filed their motion for summary

17   judgment, they requested to file this exhibit under seal.  The undersigned granted defendants'

18   request because disclosure of the exhibit, even with redaction, would jeopardize the safety of the

19   confidential informant named therein and the security of the institution at which the informant

20   was housed.  See Bruce v. Ylst, 351 F.3d 1283 (9th Cir. 2003) (the statement of a confidential

21   prison informant can satisfy the "some evidence" standard with respect to a gang validation by

22   prison officials).  Exclusion of this evidence from the court's consideration on summary judgment

23   is neither warranted nor justified.

24        Finally, in his opposition to defendants' motion for summary judgment, plaintiff seeks to

25   exclude defendants' evidence, or estop defendants from relying on evidence, regarding the

26   "modified program" at issue in this case because plaintiff supposedly did not have reasonable

27   notice that defendants would raise an "inconsistent modified program claim" on summary

28   judgment.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J./Cross-Mot. for Summ. J. at 54-59.)  Plaintiff

1   contends that he did not raise any claims related to a modified program in his amended complaint,

2   and defendants did not mention the modified program in their answer to his complaint.  (Id.)

3         Once more, plaintiff's request is without merit.  See New Hampshire v. Maine, 532 U.S.

4   742, 749-51(2001) (a court may invoke judicial estoppel at its discretion); Hamilton v. State Farm

5   Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001) ("Judicial estoppel is an equitable doctrine

6   that precludes a party from gaining an advantage by asserting one position, and then later seeking

7   an advantage by taking a clearly inconsistent position.").  As an initial matter, in defendants'

8   answer to plaintiff's amended complaint, they denied all of his factual allegations.  (Doc. No. 30)

9   In addition, during the discovery phase of this litigation, defendants gave plaintiff ample notice of

10  their belief that they had subjected him to a modified program and not a SCU/SPSU or

11  administrative segregation.  For example, throughout defendant Davey's responses to plaintiff's

12  discovery requests the defendant repeatedly responded "Without waiving these objections,

13  Defendant responds that Plaintiff was not placed in segregation but was placed on a modified

14  lockdown program between October 6, 2009 through May 26, 2010."  (Pl.'s Mot. to Compel Ex.

15  B.)  Defendants Vanleer, Sanders, Domondon, and Gower included identical or similar language

16  in their discovery responses.  (Id. Exs. C-F, H & K.)  Thus, defendants have not taken a later

17  position that is "clearly inconsistent" with any earlier litigation position taken and application of

18  the principle of judicial estoppel is not appropriate.  New Hampshire, 532 U.S. at 750.

19        Accordingly, for all of the foregoing reasons, the court will deny plaintiff's requests to

20  exclude certain evidence.

21        Also pending before the court is plaintiff's request for judicial notice of various website

22  documents related to assorted diseases, which plaintiff believes highlights the risks associated

23  with him being deprived of certain personal hygiene items.  (Doc. No. 79)  For the reasons

24  discussed above, the court finds that the information of which plaintiff seeks that judicial notice

25  be taken is unnecessary to this court's analysis and resolution of the motions for summary

26  judgment with respect to his personal hygiene items claim.  Accordingly, the undersigned will

27  deny plaintiff's request as unnecessary.

28  /////

1   Finally, defendants have filed a series of evidentiary objections to plaintiff's response to

2   their statement of undisputed facts and to plaintiff's separate statement of undisputed facts.  (Doc.

3   Nos. 87 & 88.)  Defendants have also filed a motion to strike and objections to plaintiff's

4   declaration and several of plaintiff's exhibits filed in support of his motion for summary judgment

5   and his opposition to defendants' motion for summary judgment.  (Doc. No. 89)

6   Insofar as defendants' objections are relevant to the court's disposition of the pending

7   motion for summary judgment as set forth herein, they are overruled, and defendants' motion to

8   strike is denied.  The undersigned finds it would be an abuse of discretion to refuse to consider

9   evidence offered by a pro se plaintiff at the summary judgment stage.  See e.g., Jones v. Blanas,

10  393 F.3d 918, 935 (9th Cir.2004) (reversing and remanding with instructions to consider evidence

11  offered by the pro se plaintiff in his objections to the findings and recommendations).  In any

12  event, given the recommendation set forth above that defendants' motion for summary judgment

13  be granted, defendants' evidentiary objections and motion to strike are unnecessary.

**CONCLUSION**

15  IT IS HEREBY ORDERED that:

16  1.  Plaintiff's requests to exclude certain evidence (Doc. Nos. 74 & 78) are denied;

17  2.  Plaintiff's request for judicial notice (Doc. No. 79) is denied as unnecessary;

18  3.  Defendants' evidentiary objections (Doc. Nos. 87-89) insofar as they are relevant to the

19  court's disposition of the pending motion for summary judgment are overruled, and defendants'

20  motion to strike (Doc. No. 89) is denied.

21  IT IS HEREBY RECOMMENDED that:

22  1.  Defendants' motion for summary judgment (Doc. No. 86) be granted as follows:

23  a.  Defendants' motion for summary judgment on plaintiff's Fourteenth

24  Amendment Due Process claims be granted;

25  b.  Defendants' motion for summary judgment on plaintiff's Eighth Amendment

26  claim based on the denial of outdoor exercise be granted on the basis of the

27  affirmative defense of qualified immunity;

28  /////

70

1           c.  Defendants' motion for summary judgment on plaintiff's Eighth Amendment

2           claim based on his placement in a cold cell be granted;

3       2.  Plaintiff's Eighth Amendment claim based on defendants' alleged refusal to provide

4 him with personal hygiene items be dismissed for failure to state a cognizable claim for relief;

5       3.  Plaintiff's motion for summary judgment (Doc. No. 74) be denied; and

6       4.  This action be closed.

7       These findings and recommendations are submitted to the United States District Judge

8 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

9 after being served with these findings and recommendations, any party may file written

10 objections with the court and serve a copy on all parties.  Such a document should be captioned

11 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

12 objections shall be filed and served within seven days after service of the objections.  The parties

13 are advised that failure to file objections within the specified time may waive the right to appeal

14 the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15 Dated:  September 14, 2015

16

17                 _____

18                 DALE A. DROZD
                UNITED STATES MAGISTRATE JUDGE

19 DAD:9
   gome0649.57

20

21

22

23

24

25

26

27

28

71